Arlene C. WOLF–LILLIE, Plaintiff,

v.

KENOSHA COUNTY SHERIFF,
Defendant.

No. 77–C–331.

United States District Court,
E. D. Wisconsin.

Regarding Liability Nov. 1, 1979.
Regarding Damages Dec. 15, 1980.

2

Louis J. Mestre, Legal Action of Wisconsin, Inc., Milwaukee, Wis., for plaintiff.

Bruce E. Schroeder, Schroeder, Ventura & Breitenbach, Kenosha, Wis., for defendant.

## MEMORANDUM AND ORDER
## REGARDING LIABILITY

WARREN, District Judge.

This is a civil action in which the plaintiff, Arlene C. Wolf-Lillie, alleges that the Sheriff of Kenosha County, Gerald M. Sonquist, is liable for damages stemming from the violation of her constitutional rights when the sheriff's deputies executed an outdated writ of restitution. This action is brought pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 1343. Pursuant to the requests of the parties, the Court ordered the bifurcation of this trial. Therefore, this memorandum and order will constitute the Court's findings of fact and conclusions of law regarding the issue of liability.

According to the facts brought out at trial, on March 2, 1977, the Kenosha County Small Claims Court entered a judgment of eviction against the plaintiff pursuant to an action brought by her landlord. In addition to the judgment, the county court judge also issued a writ of restitution on March 11, 1977, ordering the sheriff to remove the plaintiff and her personal property from the lots she occupied in the Lakecrest Mobile Home Park in Silver Lake, Wisconsin. The writ of restitution was received by the sheriff's department on March 22, 1977.

On March 28, 1977, a copy of the writ was served on the plaintiff. Although the original terms of the writ ordered the sheriff to remove the plaintiff immediately, the copy of the writ served on the plaintiff contained an interlineation giving her five days to voluntarily remove herself. Furthermore, there was testimony at the trial that indicated that it was common practice on the part of the sheriff's department to give persons five days to remove their belongings voluntarily before the sheriff's department would do so by force, if necessary. (Trial transcript, pp. 30–31, 95–97).

On April 22, 1977, one month after receipt of the writ, deputy sheriffs Wayne Gransow, Richard Harrison, and Robert Tudjan were sent out to execute the writ of restitution. The deputies executed the writ and removed the plaintiff's trailer and her other personal property from the lot in the Lakecrest Mobile Home Park. From the testimony at the trial, it is also clear that Sheriff Sonquist was not present during the actual execution of the writ and the removal of the trailer. (Trial transcript, p. 21).

The facts of this case present two issues regarding the defendant's liability: first, whether the plaintiff's constitutional rights were violated when the deputies removed her trailer; and second, whether the defendant is responsible for the possible violation.

■ To determine whether the plaintiff was deprived of her property without due process of law in violation of the fourteenth amendment, the Court must first ascertain whether she, in fact, had any protectable property interest in remaining in possession of the lot she occupied. To determine the existence of such a property right or interest, the Supreme Court has held that a court must look to the state law. *Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976); *Perry v. Sinderman*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). If the state has created a statutory property interest, then that interest may not be affected unless that person is afforded due process.

■ Section 704 of the Wisconsin Statutes sets out the rights and liabilities of landlords and tenants. This statute creates a property interest in a tenant and provides a certain protection for the tenant. Considering the statute and the common law property rights of a lessee, the Court finds that the plaintiff did have a protectable property interest under the fourteenth amendment.

■ Section 704 and section 299 of the Wisconsin Statutes also set forth the procedure that must be followed to effect the property interest created by the statute. The plaintiff here does not contest that the statutory procedure afforded her the requisite due process required under the fourteenth amendment. Rather, the plaintiff

**4**

alleges that the defendant failed to follow the statutory procedure, and this failure resulted in a violation of her due process rights. The Court notes that the provisions of section 299 have been held to comport with due process. *Wegwart v. Eagle Movers, Inc.*, 441 F.Supp. 872, 879–80 (E.D.Wis. 1977). Where the state has established a procedure which comports with due process, state and local officials are bound to follow those procedures. *Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974).

Sections 299.44–45 of the Wisconsin Statutes provides that upon a finding that a person is entitled to possession in an eviction action, the court shall order that a writ of restitution be issued and delivered to the county sheriff within 30 days. Section 299.-44(2). After delivery of the writ to the sheriff, the statute provides:

> within ten days of the receipt of the writ, the sheriff shall execute the writ and perform all the duties required by this section and return the same to the court with his statement of the charges incurred in the execution of this writ and paid by the plaintiff. Section 299.45(5). (emphasis added).

Other provisions of these sections elaborate the method of executing a writ of restitution.

Plaintiff contends that because the eviction remedy is statutorily created, it must be strictly adhered to and its provisions are mandatory. *Liberty Loan Corporation and Affiliates v. Eis*, 69 Wis.2d 642, 646–47, 230 N.W.2d 617 (1975). In *Eis*, the Wisconsin Supreme Court held that because the state garnishment remedy was statutorily created, strict compliance with all its procedures was necessary. *Id.*

The defendant argues that the statute is not mandatory and that a writ is valid until some relief is obtained.

At trial, Dean Robert Boden, the reporter for the committee which drafted the statute, testified that he was unsure whether the statute was jurisdictional or not. He did indicate that he believed the statute was phrased in terms of a directive to the sheriff. (Trial transcript, pp. 127–128).

Dean Boden also testified that both the thirty-day time limit and the ten-day time limit in sections 299.44 and 299.45 were intended to cure previous abuses of the system. Under the previous law, according to Dean Boden, a landlord who obtained a judgment of eviction would not seek a writ of restitution until sometime after the judgment was entered. Then, apparently, the writ would be used to evict the tenant on some more recent default. (Trial transcript, pp. 125–27). The legislation was intended to cure this abuse and avoid surprise. *Id.*

■ Although the Wisconsin Supreme Court has not interpreted section 299.45(5), this Court finds the language and the legislative history of the statute very clear. The Court finds that the language of section 299.45(5) is mandatory by nature and requires the sheriff to execute a writ of restitution within the ten-day period. Furthermore, the Court finds that this statute creates a non-delegable duty on the part of the sheriff to see that writs of restitution are not executed beyond the ten-day period. The interpretation suggested by the defendant is contrary to the intent of the legislature because it would, in effect, usurp the discretion given to the judge to grant a stay of the writ.

■ Section 299.44(3) sets forth the standards for the granting of a stay and the prerequisites. Neither that section nor any other applicable section gives the sheriff any discretion to delay the execution of a writ beyond the ten-day period. Based on the foregoing, the Court finds that a writ of restitution not executed and returned within ten days of receipt by the sheriff is invalid on its face.

Defendant asserts that the original writ was not invalid, even though executed beyond the ten-day period because a stay of the writ had been ordered by Judge Fisher of the county court. In the alternative, defendant argues that there was a subsequent oral writ issued which was effective on the date of execution.

At trial, Officer Gaylen Rogers testified that he vaguely remembered receiving a phone call from Judge Fisher, who had authorized the writ, ordering him to hold off on the execution because some motion had been filed. The officer also stated that he then placed the writ in the hold bin and did not act on it. Deputy Rogers was unable, however, to state when he received the call from Judge Fisher. He did, however, admit on cross-examination that the call might have been received after the expiration of the ten-day period. Furthermore, he testified that he received another phone call from Judge Fisher sometime later ordering him to proceed with the writ.

Judge Fisher testified that he could not recall any such conversations and that he handled very few writs. He also stated he did not believe he had ever called the sher-. iff's office regarding this case (Trial transcript, p. 148), although he had a vague recollection that he once spoke to deputy Rogers in his office regarding the eviction case. Finally he testified that he did not remember anything about the eviction proceeding which would have caused him to invalidate or stay the writ.

Sheriff Sonquist also testified that he had received numerous oral orders from county judges regarding certain criminal matters. He could not, however, remember ever receiving an oral order to execute or stay a writ of restitution.

Section 299.44(3) provides that the judge shall issue a writ of restitution after judgment, unless he determines that the issuance of a writ would cause a hardship. Before granting a stay, however, the statute requires that the one who is to be evicted must pay all rent due and owing, as well as that which comes due during the stay. The statute also provides with specificity the form of a writ. Oral writs are not mentioned or provided for in the statute.

█ Considering the requirements of the statutory section, as well as the testimony in this case, the Court finds that there was no stay of the writ of restitution. The testimony of both Officer Rogers and Judge Fisher is inconclusive. Deputy Rogers could not remember when he received the alleged call from Judge Fisher ordering him to stay the writ. In fact, he testified it could have been beyond the ten-day limit. Judge Fisher's testimony also indicated a lack of memory concerning the whole affair. He was, however, more certain that he did not contact Deputy Rogers regarding this writ. In addition, because of the requirements of the statute, it is unlikely that the judge would issue a stay of the writ without ascertaining whether the plaintiff had paid the rent due and owing. Furthermore, it is uncertain from the language of the statute whether a writ could be stayed after it was issued. The statute speaks in terms of a stay of the issuance of the writ and not of its execution, and a strict interpretation of the statute would require the writ to be executed once it is issued.

The defendant's assertion that there was a subsequent oral writ issued is also unfounded. The testimony of Judge Fisher and Deputy Rogers do not support such a contention. In addition, it is clear that the statute does not anticipate oral writs of restitution. This is especially true because the statutes provide for delivery of a copy of the writ to the one evicted. Section 299.45.

█ For the foregoing reasons, the Court finds that the writ of restitution executed in this case thirty days after receipt by the sheriff was invalid when executed. Furthermore, the Court finds that the execution of the invalid writ violated the plaintiff's right to due process under the fourteenth amendment.

The remaining question to be resolved is whether the defendant can be held liable for this violation of the plaintiff's constitutional rights. The plaintiff alleges that the execution of the invalid writ in this case was part of an unwritten policy in the sheriff's office allowing deputies to execute writs beyond the ten-day statutory period. Plaintiff alleges that there was a pattern and practice of such abuse and that the defendant was aware of this practice and approved or acquiesced in it.

Defendant alleges that there is no "affirmative link" between the actions of his deputies and his action or nonaction. Furthermore, he alleges he had no knowledge that this writ was executed beyond the ten-day period.

At trial, Deputy Gransow testified that approximately twenty-five percent of the writs of restitution were executed beyond the ten-day period. (Trial transcript, pp. 39–42). According to his testimony, a certain number of writs were executed beyond the ten-day period at the request of counsel. Apparently, the parties' counsel would call the sheriff's office requesting that it hold off on executing a writ because something was going to be worked out. *Id.* Deputy Gransow also testified he received no instructions on what to do if a writ was outdated.

Attorney Larry Farris also testified that he examined the records of the Kenosha County Sheriff's Department for the three-year period from January 1, 1976 to December 31, 1978. On the basis of his examination, he testified that during that period, the sheriff's department had executed and returned 119 writs of restitution. Of the 119 writs that were executed and returned, Mr. Farris testified that 68 were executed beyond the ten-day period. (Trial transcript, pp. 133–34).

The defendant, Sheriff Sonquist, testified that he had no knowledge of the writ in question and he did not know of any writs being executed beyond the ten-day period during his 30 years of service as a member of the sheriff's department. He also testified that he did not provide the deputies with any formal training regarding the service of process, except that they were told to read the statute and manual. Sheriff Sonquist also admitted that there was no follow-up instruction given and that it was conceivable that deputies in the process division might never read the materials. The defendant further testified that he was aware of and approved of the practice of giving persons five days to voluntarily remove themselves before the sheriff executed the writ. According to Sheriff Son-

quist, this had been a thirty-year tradition with the department.

At the outset, this Court recognizes that under the rule of *Adams v. Pate*, 445 F.2d 105 (7th Cir. 1971), a superior officer or employer cannot be held responsible for the acts of his employees or subordinates on the basis of *respondeat superior.* The rejection of *respondeat superior* as a basis for liability under section 1983 was recently affirmed by the Supreme Court in *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The *Monell* Court held that a municipality could not be liable merely because one of its employees inflicted an injury on someone. *Id.* at 694, 98 S.Ct. at 2037. The Court, however, did not totally reject the concept of holding a superior liable for the acts of his employees. Rather, the Court held that in order to hold a superior or a municipality liable, there must be a showing of some policy, pattern, or practice of the superior or municipality which caused or allowed the employee to violate a person's constitutional rights. *Id.* at 690–92, 98 S.Ct. at 2035–36. The Court indicated that a supervisor could be liable only if his action or nonaction caused another to violate a person's constitutional rights. *Id.* at 692, 98 S.Ct. at 2036.

In *Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), the Court set out the kind of causation needed to hold a superior liable. The Court held that there must be a prevasive pattern of conduct or practice by subordinates and an affirmative link between that conduct and the conduct of the superior. *Id.* at 373–75, 96 S.Ct. at 605–606.

In *Rizzo*, however, the Court held there was no showing of an "affirmative link" between the admitted constitutional violations by certain police officers and the actions of the Chief of Police. In fact, the district court had expressly found that there was no pervasive pattern of unconstitutional conduct. *Id.* at 368–71, 96 S.Ct. at 602–604.

Although *Rizzo, supra,* involved injunctive relief and not damages, the *Monell*

Court's approval of the language in *Rizzo* implies that the same "affirmative link" is necessary in an action for damages against a supervisor. 436 U.S. at 692, 98 S.Ct. at 2036. In a similar case brought directly under the fourteenth amendment, this Court held that the *Rizzo* standard was applicable in an action for damages. *Classon v. Krautkramer*, 451 F.Supp. 12, 15 (E.D.Wis.1977). Other courts in this circuit have also required a showing of an affirmative link to hold a supervisor liable for a subordinate's actions.

In *Stringer v. City of Chicago*, 464 F.Supp. 887 (N.D.Ill., 1979), the plaintiff had attempted to hold the Chief of Police liable for the acts of an individual officer. In granting a motion to dismiss for failure to state a cause of action, the court held that:

> [I]n order to establish the liability under § 1983 of supervisory officials for deprivations of constitutional rights through the acts of their subordinates, an affirmative link must be proven between their own acts or omissions and the actions directly causing the alleged violation, so that they can be said to have encouraged, approved, or acquiesced in the violation. *Id.* at 891.

The court also recognized that mere negligence was not sufficient to hold the Chief of Police liable for his subordinates' actions. Reckless indifference to constitutional violations by subordinates may, however, make supervisors liable. *Perry v. Elrod*, 436 F.Supp. 299 (N.D.Ill. 1977).

█ On the basis of the evidence before the Court, the Court finds that there was a pervasive pattern of executing writs of restitution beyond the statutory time period. The testimony of Deputy Gransow indicates that, to his own knowledge, approximately twenty-five percent of the writs were executed beyond the ten-day period. Mr. Farris' testimony is even more compelling. On the basis of his examination of the records of the sheriff's department, fifty-seven percent of the writs were executed beyond the ten-day period. Particularly disturbing to the Court is Deputy Gransow's testimony

that the delays were a result of requests on the part of attorneys made to the sheriff's department. The intent of the legislature in establishing the time limits and giving the judges the sole power to grant stays was to remove such discretion from the sheriff and to avoid surprise. The action of the Kenosha County Sheriff's department subverts this policy.

Furthermore, the Court finds that there is an "affirmative link" between the actions of the defendant and the unconstitutional action of the deputies in this case. Although the defendant testified he was not aware of the practice of executing writs beyond the ten-day period, he also testified that the only training given to deputies in the process division was to have them read the statutes and manual provided. There was, however, no follow-up to determine if the deputies did, in fact, read the material. Moreover, Deputy Gransow testified he had received no instructions regarding stale writs.

Sheriff Sonquist also testified that he was aware of and approved of the unwritten policy of giving persons five days to voluntarily remove themselves. He further testified that he did not review the procedure for executing writs when he took office. The sheriff also testified that he had reviewed the procedures of the process division after this suit was instituted and that he did not learn anything he had not already known. This testimony conflicts with his other statements indicating that he was unaware that writs were executed beyond the ten-day period.

On the basis of the foregoing, the Court finds that the defendant violated his statutory duty to insure that writs of restitution are executed and returned within the ten-day period. Because of the pervasive pattern of such violations and the defendant's own action, the Court finds that there is a sufficient link between the defendant's failure to supervise the process division and prohibit the execution of stale writs and the unconstitutional acts of his deputies.

Therefore, the Court shall set a date for a trial on the unresolved issue of damages.

SO ORDERED this 1st day of November, 1979, at Milwaukee, Wisconsin.

## REGARDING DAMAGES

In this action plaintiff, Arlene C. Wolf-Lillie, has alleged that she sustained damages when defendant Gerald M. Sonquist, the Sheriff of Kenosha County, violated her constitutional rights by permitting his deputies to execute a stale writ of restitution. Upon the request of counsel, the Court bifurcated the trial. In November of 1979, the Court found that the defendant was liable to the plaintiff for damages because he had violated her constitutional rights. In July of 1980, the Court held the damage portion of the trial. This memorandum shall constitute the Court's findings of fact and conclusions of law regarding the issue of damages.

A brief summary of the facts is necessary before proceeding to the damage issue. On March 11, 1977, the Kenosha County Small Claims Court entered a judgment of eviction and issued a writ of restitution against the plaintiff. The writ of restitution ordered the sheriff to remove the plaintiff and her personal belongings from the lots she occupied at the Lakecrest Mobile Home Park in Silver Lake, Wisconsin. The sheriff received the writ on March 22, 1977. Under the law, it was valid for only ten days. Nevertheless, on April 22, 1977, sheriff's deputies executed the writ, and the plaintiff's trailer, together with her other personal property, was removed from the lots.

At the time the trailer was removed, the mover, Bud DeBoer, asked the plaintiff where she wanted the trailer moved to. Because she objected to the removal, plaintiff refused to designate a storage place for the trailer. Consequently, the mover towed the trailer to his Service Center storage yard.

At the trial on damages, Mr. DeBoer testified that after securing and locking the trailer, he placed it outside the fenced-in area of his storage yard. A few days later, he stated that the plaintiff's former landlord sent over a number of other items left on the lot, including a metal hut, 110 patio blocks, a swing set, a canoe, a kayak, the trailer skirting, and some other miscellaneous pieces of garden equipment. Some of these items were placed in the trailer; others were placed in the fenced-in storage yard.

After the trailer was removed, Mr. DeBoer testified that he tried a number of times to get the plaintiff to tell him where to move the trailer, but to no avail. He also testified that during the time the trailer was in his possession, the plaintiff on a number of occasions would go into the trailer and either store more items there or remove some items. Plaintiff also testified to this, stating that she stored her personal belongings in the trailer because she did not have enough room for storage at her present place of residence. In fact, she testified she stored her seasonal clothes there, as well as her more valuable items because she felt they were safer there.

After each one of her visits to the trailer, Mr. DeBoer would resecure the trailer. This situation continued until January of 1979 when Mr. DeBoer apparently sold the trailer and its contents for $1,650.00. In the spring of 1979, the trailer was removed from Mr. DeBoer's premises. Mr. DeBoer also testified that the total bill for storage of the trailer was $3,206.00. Mr. DeBoer realized $881.01 from the sale of the trailer and consequently, there was $2,318.01 due and owing to him from the plaintiff.

The plaintiff, in an effort to substantiate her claim for damages, called Patrick Elliott to testify on her behalf. Mr. Elliott is an independent property damage appraiser from New Berlin, Wisconsin, with approximately ten years' experience. Mr. Elliott testified that he was hired by the plaintiff to appraise her trailer and the personal belongings she had in it at the time it was removed from the lot. According to Mr. Elliott, he inspected the trailer and its contents at its present location. Based on this inspection, he estimated the trailer to be presently worth $4,800.00. He also stated that he believed the trailer skirting to be worth $675.00, although he did not see it. As to the items of personal property he saw at the trailer, he testified that their actual

cash value would be $1,316.40 and their replacement value would be $3,460.00.

In addition to these figures, the witness also testified that in his experience, a person maintaining a life style similar to the plaintiff's would have items valued at approximately $2,256.65. Finally, he testified that in his opinion, the value of the items listed by the plaintiff in plaintiff's exhibit 1, which he did not view, was $3,965.00.

Other witnesses also testified as to the value of the trailer and the personal items of the plaintiff. Plaintiff testified that she bought the trailer in 1970 for $4,500.00. In addition, she stated that she had made numerous repairs to the trailer due to repeated acts of vandalism. She also testified that she had a number of cherished family memorabilia that were lost when the trailer was taken. Finally, she claimed that the sheriff's deputies damaged the skirting when they moved the trailer, although Mr. DeBoer does not recall any skirting.

Mrs. Verna Hehn, the assistant coordinator for the Kenosha County Assessor's Office and custodian of records there, testified at trial as to certain records in the Assessor's Office. The records, defendant's exhibits 2 and 8, indicate that the plaintiff purchased the trailer for $4,500.00 and in 1974, the trailer was assessed at $3,200.00. According to the records, plaintiff protested this assessment and after inspection of the trailer, the Assessor's Office reduced the assessment to $2,000.00. In 1975 when Kenosha County went to 100 percent evaluation, the plaintiff's trailer was assessed at $3,000.00. This assessment, however, did not properly reflect the existing damage. Therefore, in 1976, according to Mrs. Hehn, there was a deduction of $1,500.00 for presently existing vandalism.

Mr. Ernie Chioda, the manager of City View Mobile Home Park, also testified at trial. According to his testimony, he has bought and sold hundreds of mobile homes and in his opinion, Mrs. Wolf-Lillie's home was worth $1,200.00 when he appraised it in November of 1978. He also stated that in his opinion, the trailer in excellent condition would be worth $1,800.00.

Finally, the Court notes that Mr. DeBoer testified that when he moved the trailer in 1977, the inside was in very poor condition. This testimony is directly contrary to plaintiff's own statements regarding the condition of the trailer.

The only other testimony elicited at the damage trial concerned the effect the seizure of the trailer had on the plaintiff. According to her testimony, because she was unable to live where she desired, she was forced to live in a one-room studio apartment sharing a common bath facility. In addition, she testified that she has suffered great emotional distress as a result of the defendant's actions.

Plaintiff seeks damages for: the loss of her trailer; the loss of the contents of the trailer; and the storage costs she has incurred. In addition to these tangible items of damage, plaintiff has requested damages for the violation of her constitutional right to be free from unreasonable seizures; for the emotional harm she has suffered over the past three years; and for the personal inconvenience caused by the defendant's actions.

Before proceeding to a discussion of each of these items of damage, it is best to review the law regarding damages in an action brought pursuant to 42 U.S.C. § 1983. Under 42 U.S.C. § 1988, the Court is authorized to use both state and federal rules on damages in granting relief pursuant to section 1983. *Sullivan v. Little Hunting Park*, 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969). Whether looking to state or federal damage rules, the plaintiff is not required to prove her damages to a mathematical certainty. It is sufficient that she prove them by a preponderance of the evidence. In *Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978), the Court recognized that in a section 1983 action, property damages, as well as other intrinsic damages, are recoverable. A violation of constitutional rights, however, cannot make a person better off than he would have been absent the violation. *Id.* Therefore, plaintiff must prove that the

violation of her constitutional rights caused her damages.

■ Like all other persons claiming damages, plaintiff is required to exercise ordinary care to mitigate or lessen her damages. A person, however, cannot be forced to expend sums he does not have or take extraordinary action to mitigate damages. With these rules set forth, the Court turns to the plaintiff's requested items of damage.

## TRAILER

■ There was a great deal of conflicting testimony regarding the value of the plaintiff's trailer. The highest estimate, that of Mr. Elliott's, was $4,800.00; the lowest estimate was that of the sale price of $1,650.00. Ordinarily, an arm's-length transaction would be the best evidence of the fair market value of an item. In this instance, the sale of the trailer is not without some irregularity. Therefore, the Court cannot rely exclusively on the sale price. Nor does the Court find that Mr. Elliott's appraisal is the appropriate one because the Court cannot ascertain the extent of any repairs to the trailer by its new owner. The Court is of the opinion that the value of the trailer is approximately $3,000.00. This is the value given by the Kenosha County Assessor and the Court finds it to be the best estimate available. The Court further finds that the loss of the trailer was proximately caused by the defendant's action and, therefore, he is liable for the loss.

■ The Court recognizes that after the seizure of the trailer, there was a period of time in which the plaintiff could have secured the release of her trailer by simply designating a spot to which she wanted it towed. By doing so, plaintiff perhaps could have avoided the loss of her trailer. Unfortunately the plaintiff's financial status shortly after the wrongful seizure was such that she could not afford to rent a place to relocate her trailer. Therefore, the plaintiff's failure to move the trailer does not foreclose her from recovering for its loss.

## ITEMS OF PERSONALTY IN THE TRAILER AND ON THE PREMISES

Plaintiff asserts that she is entitled to approximately $13,000.00 for the loss of her personal property which was sold with the trailer. Although Mr. Elliott testified as to the value of a number of items, he could not properly link those items to the plaintiff. The Court, of course, can draw the inference that the items viewed were the same ones belonging to the plaintiff because it is undisputed that the contents of the trailer were sold with the trailer. The Court, however, finds Mr. Elliott's suggestion of other items that plaintiff might have had, given her lifestyle, too speculative to rely on. Consequently, in determining the value of the lost property, the Court will not give this testimony any weight.

■ In addition, plaintiff's practice of storing and removing items from the trailer raises a substantial question regarding the mitigation of her damages. Plaintiff's own testimony establishes that she used the trailer to store many items of personal property because she felt the items were safer there than at her apartment. That she moved things in and out of the trailer almost at will convinces the Court that she did nothing to mitigate her eventual loss of those items. Every time she placed additional objects in the trailer, she increased rather than reduced her damages. Furthermore, plaintiff testified that she lost a number of cherished family momentos, but she never removed these items from the trailer. Because of plaintiff's failure to mitigate her damages with regard to these claims, the Court cannot justify awarding her any damages for their loss.

## STORAGE COSTS

As testified by Mr. DeBoer, plaintiff still has an outstanding bill of $2,318.01 owed to him for storage of the trailer and her personal belongings. Mr. DeBoer also testified that on a number of occasions he offered to move the trailer to wherever the plaintiff wanted and that she only wanted it returned to her lot at the trailer park. The

evidence is somewhat unclear as to whether the plaintiff knew she could have the trailer moved for free or whether she was under the impression that she had to pay for the move.

It is also unclear whether Mr. DeBoer intends to ever collect the potential debt. At a number of times during his testimony, Mr. DeBoer indicated that he would be satisfied with the amount he had received from the sale of the trailer, although on further questioning he stated that he would have to contact his attorney before waiving any claims.

■ Finally, the Court notes there was no evidence that Mr. DeBoer was pursuing this matter at this time. Because of the ambiguous nature of this bill, the Court finds that the plaintiff has failed to meet her burden of proof with respect to this element of damages. Consequently, the Court declines to award her any damages for any potential storage charges.

## PHYSICAL INCONVENIENCE

■ Plaintiff has alleged that as a direct result of the defendant's actions, she suffered great personal inconvenience, including being forced to live in a one-room apartment. For this inconvenience she requests $10,000.00. Defendant argues that the plaintiff's choice of living situations after her dispossession cannot be attributed to the defendant's actions. Defendant further alleges that he was not responsible for the loss of her job or for her sporadic employment over the past three years. Her living conditions, defendant asserts, have been dictated by her income as it was prior to her removal. Finally, defendant asserts that plaintiff had no right to be on the property because of the judgment of eviction, and consequently any inconvenience she suffered was due only to her untimely removal.

The Court must agree with defendant that plaintiff has failed to demonstrate any link between his actions and the plaintiff's present living conditions. The Court, however, does find that the defendant's untimely removal of the plaintiff did cause her personal inconvenience for which she is en-

titled to recovery. *See Piorkowski v. Liberty Mutual Insurance Co.,* 68 Wis.2d 455, 228 N.W.2d 695 (1975). Considering all the evidence, the Court concludes that she is entitled to $1,000.00 for her inconvenience.

## EMOTIONAL DISTRESS AND HUMILIATION

■ Plaintiff has also claimed damages for the emotional distress and humiliation caused by the defendant's actions. The difficulty that arises here, however, is the inability of the Court to determine whether the defendant's actions caused the plaintiff's current emotional state. It is apparent from the plaintiff's behavior in Court that she is an extremely sensitive and emotional person given to sudden outbursts. It is, however, difficult for the Court to determine whether her emotional state resulted from the defendant's actions. It is, however, apparent from her testimony that the defendant's actions did cause the plaintiff some emotional distress and humiliation. *See Baskin v. Parker,* 602 F.2d 1205, 1209 (5th Cir. 1974) and cases cited therein. For this the Court finds that she is entitled to $1,000.00.

## CONSTITUTIONAL RIGHTS

Finally, plaintiff argues that she is entitled to damages for the injury to her constitutional rights. In *Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978), the Supreme Court ruled that a person is only entitled to nominal damages for the violation of his constitutional rights of due process absent a showing of actual injury. As the Seventh Circuit has most recently stated in *Konczak v. Tyrrell,* 603 F.2d 13 (7th Cir. 1979), a person whose substantive constitutional rights have been violated, even where there are no other actual damages, is entitled to damages for the violation of his civil rights. *See* Damage Awards for Constitutional Torts: A Reconsideration after *Carey v. Piphus,* 93 Harv.L.Rev. 966 (1980).

■ In this case, as the Court held earlier, the plaintiff's Fourth Amendment rights were violated by the defendant when her trailer was seized pursuant to an invalid writ of restitution. The rights guaranteed

by the Fourth Amendment to the United States Constitution are among the most important and most cherished rights which our forefathers secured for us in their revolution against England. When these rights are violated, there can be no question that a person has sustained a grievous injury. *See Konczak v. Tyrrell*, 603 F.2d at 17; *Baskin v. Parker*, 602 F.2d at 1209–10; *Seaton v. Sky Realty Company*, 491 F.2d 634, 636 (7th Cir. 1974). *Cf. Wayne v. Venable*, 260 F.2d 68 (8th Cir. 1919).

In this instance, the Court finds that plaintiff has suffered a grievous injury to her constitutional rights. Although no amount of monetary damage can adequately restore the plaintiff to her position prior to the unlawful seizure, the Court finds that an award of $4,000.00 is just compensation for her injury.

### DEFENDANT'S MOTION TO DISMISS

Finally, defendant has filed a motion to dismiss this action claiming that plaintiff will not satisfy any judgment against the defendant even if the defendant pays the judgment in full. Consequently, because plaintiff will not accept the relief, the Court is competent to give, the defendant claims that the issues are moot. Furthermore, he asserts that defendant will have to engage in further litigation to remove any judgment lien against him.

Throughout the trial of this matter, plaintiff has consistently stated that she will not accept any money from the defendant. She has repeatedly demanded that her trailer be restored to the lot from which it was removed and that there be criminal proceedings initiated against the defendant. Each time she has made these demands, the Court has informed her of its inability to give such relief. Nevertheless, she has continued to pursue this matter.

The Court recognizes that defendant indeed may have difficulty in getting the plaintiff to satisfy the judgment of the Court. This difficulty, however, is not insurmountable, nor does it necessitate dismissal of this action. Rather, on granting the plaintiff judgment against the defendant, the Court will structure its order to insure that defendant receives a satisfaction of judgment. This will alleviate any problems that defendant may have. Therefore, defendant's motion to dismiss must be and is hereby denied.

In summary, the Court finds that the plaintiff is entitled to the following amounts for damages caused by the defendant's actions:

| | |
|---|---|
| Trailer | $3,000.00 |
| Physical inconvenience | $1,000.00 |
| Emotional distress and humiliation | $1,000.00 |
| Injury to her constitutional rights | $4,000.00 |
| | $9,000.00 |

Therefore, the Court hereby orders that judgment be entered for the plaintiff and against the defendant in the sum of $9,000.00. It is further ordered that the defendant pay this sum into the Court and that the Court shall keep this sum until such time as the plaintiff executes a satisfaction of judgment to the defendant, but in no event will the Court keep this open for any period in excess of 45 days after delivery of the sum to the Court. Furthermore, if plaintiff fails to execute the satisfaction of judgment within the 45-day period, the Court will order its judgment vacated and will dismiss this action on its merits.

SO ORDERED this 15th day of December, 1980, at Milwaukee, Wisconsin.