Mervin M. MOLGAARD and Virginia C. Molgaard, Plaintiffs,

v.

The TOWN OF CALEDONIA, a body corporate; Steven Horvath, Jr.; Marcel Dandeneau; William P. Ruetz; and Richard P. Granger, Defendants.

No. 78–C–658.

United States District Court, E. D. Wisconsin.

Dec. 14, 1981.

Charne, Glassner, Tehan, Clancy & Taitelman by F. Thomas Olson and Arthur J. Harrington, Milwaukee, Wis., for plaintiffs.

Strnad & Gossens by Paul J. Gossens, Milwaukee, Wis., for defendants.

## DECISION AND ORDER

MYRON L. GORDON, District Judge.

The plaintiffs bring this action under 42 U.S.C. § 1983, alleging that the defendants violated their due process rights under the fourteenth amendment. A trial to the court on the issue of liability commenced on August 24, 1981. The parties have submitted post-trial briefs. This opinion constitutes the court's findings of fact and conclusions of law pursuant to Rule 52, Federal Rules of Civil Procedure.

## I. BACKGROUND

The plaintiffs, Mervin and Virginia Molgaard, at one time owned a parcel of land in the town of Caledonia, Racine County, Wisconsin. About 1970, the Molgaards decided to construct a mobile home park at the site. They formed the Cal-Oaks Corporation to develop the park. The park itself was to be named Calvilla. A variety of plans were prepared and financing was obtained.

Section 66.058, Wis.Stat., requires that a mobile home park be regulated by the appropriate local government. Approval of a planned park is also required. To that end, Mr. Molgaard submitted detailed preliminary plans to the town of Caledonia board in July, 1970. A formal application for a mobile home park was filed on August 11, 1970; a public hearing was held on August 17, 1970. In a letter dated August 28, 1970, the town's attorney, Kenneth Hostak, stated that the town could not issue a mobile home park permit because of the preliminary nature of the plans. He proposed that the application be held in abeyance until the plaintiffs submitted further information. Mr. Hostak noted that the board would require certain conditions, including that the park be served by public sanitary sewer and that the park be completed "within a given period of time." Plaintiffs' exh. 1; defendants' exh. 109.

In August, 1970, the town board and Caledonia Utility District # 1 brought the Molgaard property within the district's boundaries. Defendants' exh. 104. The utility district had an agreement with the city of Racine that sewage from much of the district was conveyed to the Racine sewage system where it was processed. The agreement could be amended to bring in additional areas not covered, but both the town and Racine had to consent. The Calvilla site was not within the area covered by the agreement, even though after August, 1970, it was within the utility district.

Thus there was no existing public sanitary sewer for the site.

The town board held a meeting on December 14, 1970, and expressed approval of the Molgaard application. Plaintiffs' exh. 3; defendants' exh. 114. Approval was given to Mr. Molgaard rather than to the Cal-Oaks Corporation, because the board felt that in the event of problems it could look to an individual more readily than to a corporation.

The town board chairman, Marshall Lee, sent Mr. Molgaard a letter dated December 17, 1970, informing him that the board had agreed to issue a "Mobile Home Park Permit" for the Calvilla project. Plaintiffs' exh. 4; defendants' exh. 115. Mr. Lee stated that the permit was subject to several enumerated requirements; condition four read: "The park must be served by public sanitary sewer." The letter also stated:

> "This letter does not mean that these will be the only requirements that the Town Board will establish. Others may be worked out with you before the formal issuance of the permit."

Mr. Molgaard continued to submit plans to the board well into 1971. These plans indicated that the project would be a three-stage development that would be completed in 1972.

As required by condition seven of the Lee letter, in December, 1970, the plaintiffs through Cal-Oaks applied to Racine County for zoning approval for the project. Approval was given subject to twenty-one conditions, including that the site be served by public sewer. The zoning permit was valid for six months. Racine County zoning ordinance, § 7.048(B)(2); see defendants' exh. 134. The plaintiffs did not renew the permit after the initial six month period.

At a special meeting held on April 6, 1971, the town board reaffirmed its approval of the Calvilla project. Defendants' exh. 116. The next day, elections for the town board were held; defendants Horvath and Dandeneau were elected to the board. On May 7, 1971, Mr. Molgaard appeared before the new town board to bring it up to date. He stated that the project had been ex-panded somewhat. He again stated that the project would develop over a two-year period, with one additional year if necessary. Defendants' exh. 117.

In the fall of 1971, Mr. Molgaard rough-graded the site. The topsoil on seventy-five acres was removed and piled for eventual landscaping. Work ceased however, because Mr. Molgaard did not have the necessary building permits. In the spring of 1972, rains caused the exposed dirt to wash. At least one adjacent landowner complained about dirt washing onto his property. Dirt also washed onto an adjacent town road. These and other matters made the project increasingly controversial, and in October, 1972, town residents petitioned the board to rescind the earlier approval.

During this period, the town and the utility district had been negotiating with Racine to include Calvilla in the area of sewer coverage. These negotiations proceeded fitfully, because Racine wished to alter the overall arrangement, which the town refused to do. Most of the negotiations were oral; written documents were usually created only when there were difficulties. In a letter dated October 23, 1972, Mr. Hostak requested amendment of the sewer agreement to include Calvilla. Defendants' exh. 144A. However, Racine did not accede to the town's terms until August, 1978.

In a letter dated November 17, 1972, Mr. Hostak stated that the plaintiffs had to apply for a renewal of their "license." As is explained below, this determination was based on an erroneous interpretation of the relevant town ordinances. The letter concluded: "Should you fail to do so, the Town will have no recourse but to treat [the license] as terminated." Plaintiffs' exh. 11.

On December 11, 1971, Mr. Molgaard filed an application for renewal. Plaintiffs' exh. 12. The board held a public hearing on the application on January 10, 1973. Mr. Molgaard and his attorney, Mr. Paulson, attended. The board discussed the plaintiffs' compliance with the seven conditions stated in the Lee letter of December 17, 1970. The minutes of this meeting reveal

that Mr. Hostak then raised the question of a time limit on the project, noting that there was no limit at that time. Plaintiffs' exh. 13, p. 3. Mr. Paulson stated that there was no deadline because of the uncertainty of the sewer hookup. The minutes read:

"[Mr. Paulson] assured that Mr. Molgaard wants to comply with any conditions which the Town Board might impose and would be receptive to a reasonable time schedule.... [Mr. Paulson] recognized that there has been no paper permit issued and that all that really exists at this time is a commitment by the Town Board." *Id.*

After the January 10th meeting, Mr. Hostak discussed the situation with Mr. Paulson. Each testified that there were no objections to the board's approach or to the imposition of reasonable deadlines for the project. On January 15, 1973, the board again met to consider a resolution prepared by Mr. Hostak which established several conditions and deadlines. Condition three of the resolution stated that a temporary plan for drainage had to be filed, "and the work required thereunder must be completed by May 1, 1973." Plaintiffs' exh. 27A. Condition five required service by "public sanitary sewer." *Id.* In addition, condition nine read:

"Inasmuch as more than two years have passed since a conditional permit was first approved by the Caledonia Town Board, and because the uncertainty of the development of the park has a very unsettling effect upon the neighborhood, the residents, and the Town, and because the Town Board considers it unfair to indefinitely grant conditional permits for a possible mobile home park, and because the developer knew that sewer service was not available for the site and must have known the problems involved in obtaining sewer service for the area when he first applied for a permit, the condition of public sewer availability to the park must be met no later than June 30, 1973, and the park must be completed in accord with an approved schedule within two years thereafter. In the event such conditions are not met, the permit shall become void." *Id.*

Mr. Molgaard was given the opportunity to present his position on the resolution. The minutes of that meeting state: "Upon completion of the reading of the conditions, Mr. Molgaard pointed out that only number nine might pose a problem." Plaintiffs' exh. 90. The resolution passed by a three to two vote; defendants Horvath and Dandeneau voted nay. Mr. Paulson did not attend this meeting.

In April, 1973, an election was held for the Caledonia town board. Defendants Ruetz and Granger were elected to the board. Messrs. Horvath and Dandeneau remained on the board.

No work was done to alleviate the drainage problem prior to the resolution deadline of May 1, 1973. The June 30th deadline for public sewer also passed without the installation of public sewer at the site. In addition, the town board received no communication on these topics from the Molgaards prior to June 30, 1973.

In a letter dated July 5, 1973, Mr. Paulson requested "a reasonable extension from the June 30th deadline for a formal sewer contract to be consummated." Plaintiffs' exh. 15. At a meeting held on July 9, 1973, the board considered a resolution prepared by Mr. Hostak to the effect that the permit issued to the Molgaards was void. Mr. Molgaard was present at this meeting. The board adopted the resolution; the pertinent language read: "RESOLVED, that the Conditional Permit issued by the Town Board to Mervin M. Molgaard be declared void under the conditions of the Permit." Defendants' exh. 123.

In a letter dated July 19, 1973, Mr. Molgaard requested an extension of the conditional approval for a one year period, to June 30, 1974. Plaintiffs' exh. 16. This request was denied at a general meeting of the town board held on July 23, 1973. *See* plaintiffs' exh. 85. The Calvilla project essentially ended at that point. Mr. Molgaard did complete improvements in the site's drainage. In 1976, the Molgaards filed for bankruptcy and in 1978 filed this action.

## II. THE PLAINTIFFS' CLAIM

### A. The Entitlement

█ The plaintiffs allege that the defendants violated their right under the fourteenth amendment not to be deprived of their property without due process of law. To prevail on this claim, the plaintiffs must first establish that they possessed a legitimate claim to an entitlement that was infringed by the defendants; a unilateral expectation of some benefit is not sufficient. *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). The plaintiffs argue that Wis.Stat. § 66.058(5) creates a procedure for consideration of the plaintiffs' application which the defendants were obliged to follow. Section 66.058(5) reads in pertinent part:

> *"(5) Plans and specifications to be filed.* Accompanying and to be filed with an original application for a mobile home park, shall be plans and specifications which shall be in compliance with all applicable city, town, or village ordinances and provisions of the state board of health. The clerk after approval of the application by the governing body and upon completion of the work according to the plans shall issue the license."

The plaintiffs acknowledge the existence of the traditional two-part analysis of a due process claim: was there an entitlement to a benefit, and were the delineated procedures followed. *See Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972); *United States Labor Party v. Oremus*, 619 F.2d 683, 689 (7th Cir. 1980). The plaintiffs contend that in this case the benefit and the procedure are the same thing; the plaintiffs' entitlement was that the town follow the procedures established in section 66.058(5).

To support this contention, the plaintiffs look to the cases of *Three Rivers Cablevision, Inc. v. City of Pittsburgh*, 502 F.Supp. 1118 (W.D.Pa.1980), and *Wolf-Lillie v. Kenosha County Sheriff*, 504 F.Supp. 1 (E.D. Wis.1980). I do not believe that these cases can be read to support the result sought by the plaintiffs.

In *Three Rivers*, the city of Pittsburgh took bids on the awarding of a cable television contract. The plaintiffs in that case submitted a bid, but the contract was awarded to another bidder, despite alleged deficiencies in that bidder's proposal. The plaintiffs argued that the winner got the contract because of an unstated preference for that bidder by Pittsburgh officials. The *Three Rivers* defendants sought summary judgment, in part for failure to state a claim upon which relief could be granted.

The trial court analyzed the nature of the plaintiffs' due process claim and denied the defendants' motion. The court stated:

> "Thus, in each due process case we have a separate benefit (the liberty or property interest) and a separate procedure (the delineated process due) involved. And to the extent that plaintiffs are pleading the deprivation of a protected interest as a result of council's failure to apply the provisions of the [bidding statutes] to [the successful bidder], plaintiffs' protected *interest* and the *process due* obviously are one and the same, for the process they seek is, of course, adherence to the said provisions. In short, in our judgment there can be no property interest in a procedure itself; if there be a protected interest involved here, it is to be found in the *benefit* whose enjoyment is sought to be regulated by the procedure; namely, the award of the contract." *Three Rivers*, at 1128–29 (emphasis in the original) (footnote omitted).

█ Although certain language in the above passage could be read to support the instant plaintiffs' position, I am satisfied that when read as a whole the *Three Rivers* decision does not stand for the proposition that one can have a constitutionally protected property interest in a state law procedure. *See Three Rivers*, at 1129, n.10. A separate property interest must also be present; as the *Three Rivers* court states, the interest in that case was in the contract sought. Similarly, in *Wolf-Lillie*, the property interest was the interest of a tenant in the rented premises, delineated by state law as a property interest, *Id.*, at 3. The in-

fringement was the failure of the state authorities to follow the mandated procedures to divest the tenant of that property interest. *Id.*, at 3–5. Thus I find no merit in the plaintiffs' argument that they have a property interest solely in the procedures themselves.

■ Nevertheless, the record does establish that the plaintiff received some sort of approval from the board. The December 17th letter from Chairman Lee is evidence of conditional approval for the Calvilla project. However, the defendants cogently argue that the approval evidenced by that letter is highly contingent. The Lee letter sets up seven separate conditions, many of which were beyond the control of the Molgaards. In addition, the letter itself mentions that further conditions could be established before a "formal" permit was issued.

The Lee letter indicates the highly informal nature of the dealings between the town board and the Molgaards. The record reveals that the town did not closely supervise the Calvilla application; the record also reveals that the plaintiffs did not fulfill many of the conditions mentioned in the Lee letter and only loosely adhered to several others.

The record is clear on one issue—Mr. Molgaard was never actually awarded a license for the operation of a mobile home park. Despite the differing interpretation by the town board and its attorney, Section 66.058(5) contemplates the issuance of a license only after a mobile home park is completed and ready for operation. The plaintiffs concede that at best what they received from the board was a conditional approval of the Calvilla plans.

Nonetheless, the plaintiffs argue that once the town board approved the plans, they had a property interest under section 66.058(5) to complete the project in accordance with those plans. This argument ignores the facts of this case. The plaintiffs never received final, unconditional approval of their project; the town in effect said that the plans submitted were acceptable as far as they went, but that other matters had to be addressed prior to approval. In addition, several of the conditions were beyond the plaintiffs' control. I find that the plaintiffs only had a unilateral expectation that the plans might be approved; they had no cognizable property interest.

This conclusion is borne out when the state law governing this situation is considered, as it must be. *See Bishop v. Wood*, 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976). In *Edelbeck v. Town of Theresa*, 57 Wis.2d 172, 203 N.W.2d 694 (1973), the Wisconsin supreme court considered the constitutionality of section 66.-058(5). The court stated:

"The trial court ruled that a property owner gains no status under this section until he files a park plan with the municipality which conforms to state and local regulations. Appellants argue that under this interpretation they would be forced to expend large sums of money without any assurance of eventually being granted a park permit. This, they contend, is an unconstitutional interpretation of the applicable statute. The trial court was entirely correct in its interpretation of sec. 66.058(5), Stats. The statute clearly mandates the clerk of a municipality to issue a mobile home park license after completion of the park's construction according to the previously approved plans. It is true that some money must be expended by a property owner in the preparation of his mobile home park plans. . . . [A] reasonable refusal to approve a mobile park home [sic] plan is not an unconstitutional deprivation of the money expended in seeking the park plan's approval. We conclude that the trial court's interpretation of sec. 66.058(5) is entirely correct and reasonable and that such interpretation does not result in an unconstitutional deprivation of property should the plan be reasonably refused." *Id.*, at 182, 203 N.W.2d 694.

■ Although the plaintiffs cite *Edelbeck* to support their position, I read this passage to mean that one who proposes to build a mobile home park acquires no property right under Wisconsin law until the application submitted conforms to all rele-

vant regulations *and* is approved. This was not the situation with the Molgaard application at the time of the Lee letter. The conditions set forth in that letter demonstrate that the plans did not yet conform with the applicable laws and complete approval was not given. Mr. Lee testified that in effect the town board was saying that it approved what it saw, but more was needed before complete approval could be given. No entitlement in favor of the plaintiffs is present on these facts.

Nothing is altered by the town board's reaffirmance of its conditional approval on April 6, 1971. The record establishes that the plaintiffs had not complied with several conditions of the Lee letter at that time. Mr. Lee testified that the April 6th action only restated the board's *intent* to issue a permit for the project. No subsequent action of the town board can be construed as final approval of the Calvilla application. Assessing the record as a whole, I find that the plaintiffs possessed no property right, for final approval of the project's plans was never granted, as required by section 66.-058(5).

### B. Denial of Due Process

■ Even if the plaintiffs could establish the existence of a property interest protected by the constitution, I am not persuaded that their due process rights were infringed. The plaintiffs contend that once the board gave its conditional approval to the plans, they had a right to proceed to completion of the project without interference from the board. They contend that the imposition of further conditions by the board was an unauthorized act under section 66.058(5).

The plaintiffs concede that under section 66.058(5) the board could impose conditions on their approval of the plaintiffs' application, but once approval was given, no further conditions could be imposed. The plaintiffs' position is not supported by the statute. Section 66.058(5) is notably silent on the procedures to be followed when considering an application for a mobile home park. The key line reads: "The clerk after approval of the application by the govern-

ing body *and* upon completion of the work shall issue the license." *Id.* (emphasis added). This sentence contains no guidance as to the procedures to be followed prior to approval of the application. Indeed, this sentence does not mention authority to issue conditions to the approval, although the plaintiffs agree that the board possessed that power.

*Edelbeck* contains no guidance on this question. That case does not address the procedures to be followed prior to approval of an application. The *Edelbeck* court states that the board has the power reasonably to refuse approval of an application. The court also notes: "The statute clearly mandates the clerk of a municipality to issue a ... license *after* completion of the park's construction according to the previously approved plans." *Id.*, at 182, 203 N.W.2d 694 (emphasis added). There is no other discussion of the procedures applicable to section 66.058(5).

I find that the board did have the power to alter its conditions, so long as it acted reasonably. The alternative, argued by the plaintiffs, is that once the board acted it could never again act, regardless of how the situation had changed. This position is untenable, for it would mean that even if a mobile home park project was unfinished years after initial approval, the board could do nothing but patiently wait completion, no matter how difficult the situation was, or whether the applicable zoning and other regulations had changed.

■ The plaintiffs' position also fails when the approval itself is considered. Even if it is assumed that the Lee letter constitutes an entitlement, the letter itself provides for the imposition of further conditions. Mr. Lee also testified that the board was not granting an indefinite approval. An entitlement must be considered according to the "existing understandings" which surround it. *See Perry v. Sindermann*, 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972). Given the qualified nature of the Lee letter, and the explicit reservation of further conditions if circumstances

should warrant, the board did not infringe what it had given by later imposing further conditions.

I also find that the conditions imposed by the defendants in January, 1973, were reasonable. The town board was faced with a problem of increasing severity. The Calvilla project was becoming increasingly controversial. The drainage problem, caused by the incomplete nature of the project, was a problem for adjoining landowners and the town itself. Calvilla was also a long way from completion, and the town's original conditions for approval had not been met. In addition, both Mr. Molgaard and his attorney, Mr. Paulson, recognized that some timetable for the completion of the project was necessary. In this situation, deadlines for the satisfaction of certain conditions were not simply reasonable, but prudent.

The plaintiffs contend that the deadline for completion of the drainage plan was too short, given the spring weather normally confronted in this region, and that the drainage difficulties were caused by the defendants' order to stop work in 1971. There was some testimony that Mr. Hostak and certain members of the town board told Mr. Molgaard that he could not continue construction of mobile home units without the proper work permits. However, that was over a year before the board's setting of the May 1, 1973, deadline. The plaintiffs offer no explanations for why the drainage work was not completed before the deadline, nor do they explain their failure to request an extension of the deadline prior to its passing.

The plaintiffs also contend that the availability of sewer service was under the control of the defendants, and thus that deadline is also unreasonable. However, this was the case even at the time of the Lee letter. The record amply demonstrates the board's efforts to obtain the necessary sewer agreements. The short answer is that sewer availability was not under the board's control either; the city of Racine held the final say. The Calvilla sewer was part of a much larger negotiation, with significant matters for the town at stake. Nothing in the record suggests that the town acted in any way to forestall the sewer negotiations because of any intent to sabotage the Calvilla project.

The plaintiffs contend that the requirement of public sewer at that time was unreasonable. This contention is unsupported. The record demonstrates that there were sound reasons for this requirement. For example, the state department of natural resources discouraged the proliferation of private sewer plants. The plaintiffs also argue that the six month period was unreasonable, because the sewer pact with Racine was not accomplished until 1978. The record contains no evidence that the six month requirement was unreasonable at the time it was imposed. Even at the July 23, 1973, meeting, Mr. Paulson stated that he would not have questioned the deadline at the time it was imposed. Defendants' exh. 151. In addition, the plaintiffs offer no explanation for their failure to come to the board to request an extension of the June 1, 1973 deadline for sewer. The tardiness of the request for an extension must be fully charged to the plaintiffs.

Even if the defendants' actions were not authorized, it is well-settled that a violation of a state statute does not in and of itself establish a constitutional violation. *Snowden v. Hughes*, 321 U.S. 1, 11, 64 S.Ct. 397, 402, 88 L.Ed. 497 (1944); *Ortega v. Ragen*, 216 F.2d 561, 562 (7th Cir. 1954). However, "[b]efore a person is deprived of a protected interest he must be afforded opportunity for some kind of hearing . . . ." *Board of Regents, supra*, 408 U.S. at 570 n.7, 92 S.Ct. at 2705 n.7. The plaintiffs assert that the defendants did not afford them "an opportunity to be heard . . . at a meaningful time and in a meaningful manner." *Fuentes v. Shevin*, 407 U.S. 67, 80, 92 S.Ct. 1983, 1994, 32 L.Ed.2d 556 (1972); quoting *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965). The plaintiffs argue that Mr. Molgaard did not receive adequate notice of the

board's hearing on July 9, 1973, and thus was not able to prepare adequately for the board's action to terminate the conditional approval.

The town board took several steps to notify Mr. Molgaard of the July 9th meeting, see defendants' exh. 123, but Mr. Molgaard was not available. Mr. Horvath eventually sent the chief of police to the Molgaard residence. The adequacy of the board's efforts is not really pertinent however, for the plaintiffs' focus on the July 9th meeting is misplaced. That meeting was a mere formality to confirm what had already been done. The conditional approval by its own terms expired on June 30, 1973, because of the plaintiffs' failure to meet its conditions. At the July 23rd meeting, even Mr. Paulson recognized that the action on July 9, 1973, was probably unnecessary. See defendants' exh. 151. Thus the crucial period was earlier, when the board established the deadlines.

As discussed above, the board mistakenly thought that renewal of the conditional approval was required by the relevant statutes. Mr. Hostak's letter dated November 17, 1972, informed the plaintiffs of this. The plaintiffs filed an application for renewal on December 12, 1972. The board held a hearing on January 10, 1973; Mr. Molgaard and his attorney were present and both spoke at length. The board postponed any decision until a subsequent meeting on January 15, 1973. At the latter meeting, the resolution containing the deadlines was presented. Mr. Molgaard was present and was permitted to address the board about the resolution. The board then adopted the resolution incorporating the deadlines.

I have no hesitation on this record concluding that the board's actions gave the plaintiffs meaningful notice and an opportunity to be heard. This entire process took almost two months. Mr. Molgaard was able to present his position and was represented by counsel, who also spoke. The conduct of the board reveals that it showed ample attention to the plaintiffs' rights. I also note that even after the termination of the con-

ditional approval on June 30, 1973, the board attempted to notify the plaintiffs of its intended action. When Mr. Molgaard argued that he was unprepared, the board allowed him to appear again, at the meeting held on July 23, 1973. Mr. Molgaard and his attorney both appeared, and both argued for an extension of the conditional approval. The board responded that if the Molgaards wished to submit a new application they could do so, but that the failure to meet the deadlines meant that the earlier conditional approval had expired, and the untimely request for an extension was denied. I am satisfied that the board's conduct did not infringe the plaintiffs' constitutional right to due process.

### III. OTHER ISSUES

#### A. Failure to Join Cal-Oaks Corp.

The defendants contend that Cal-Oaks Corp. is the true party in interest in this matter. This argument is more fully discussed in an earlier decision in this case, filed by me on August 19, 1981. While there are several items in the record which tend to support this position, there is other very substantial evidence which indicates that the existence of Cal-Oaks was ignored by both the town and the plaintiffs virtually from the beginning of their relations. Considering the record as a whole, I find that Cal-Oaks is not a true party in interest.

#### B. Waiver and Estoppel

The defendants contend that the plaintiffs acquiesced in the establishment of the deadlines and thus cannot now complain about their imposition. Mr. Molgaard testified that he objected to the renewal process when it was proposed; this testimony has not been controverted. In addition, the plaintiffs were given little choice regarding the renewal. See plaintiffs' exh. 11. The defendants correctly argue that when the deadlines were imposed, Mr. Molgaard and his attorney agreed to their imposition, but the defendants have presented no evidence to show that they would have acted differently in the absence of such agreement. Attorney Hostak testified that he was alert

for any objections so that he could review their position, but nothing in his testimony suggests that the board would have acted differently.

I find that the defendants have not met their burden to establish that the plaintiffs knowingly waived any constitutional claims they may have had at the time of the hearing, or even that the plaintiffs had such a claim at that time. *See Fuentes, supra,* 407 U.S. at 95–96, 92 S.Ct. at 2001–02. I also find that the defendants have not met their burden in establishing a claim of estoppel, for at minimum they failed to show any reliance on the plaintiffs' alleged acquiescence. *See Packard Bell Electronics Corp. v. Ets-Hokin,* 509 F.2d 634, 637 (7th Cir. 1975); *Triple Interest, Inc. v. Motel 6, Inc.,* 414 F.Supp. 589, 595 (W.D.Wis.1976).

## C. Good Faith

The individual defendants contend that even if the plaintiffs' constitutional right to due process was infringed, they were acting in good faith. Because consideration of this matter requires evaluation of the testimony, in the interest of judicial economy, I will reach this issue.

■ Public officials acting in their official capacity may be immune from liability under section 1983, but not if they "knew or reasonably should have known" that their actions would violate the constitutional rights of the party affected, or if they took the action "with the malicious intention to cause a deprivation of constitutional rights or other injury." *Wood v. Strickland,* 420 U.S. 308, 322, 95 S.Ct. 992, 1000, 43 L.Ed.2d 214 (1975). An official "will not be shielded from liability if he acts 'with such disregard of the [plaintiff's] clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith.'" *Procunier v. Navarette,* 434 U.S. 555, 562, 98 S.Ct. 855, 859, 55 L.Ed.2d 24 (1978), quoting *Wood, supra,* at 322, 95 S.Ct. at 1000.

■ Defendants Ruetz and Granger were elected to the town board in April, 1973. Accordingly, they had no part in the board's establishment of the deadlines. I can find no basis for liability on the part of these two defendants stemming from that action. Both of them were present at the July 9, 1973, meeting, and both voted in favor of the resolution that the approval was void. This action merely affirmed what had previously been done. They were also present at the July 23rd meeting, and both voted against the plaintiffs' request for an extension. As previously noted, that request was untimely. Mr. Molgaard was allowed to speak at the meeting, as was his attorney. Messrs. Ruetz and Granger testified that they voted against the extension in part because the plaintiffs had not complied with the May 1st deadline for solving the drainage problem.

I find that Messrs. Ruetz and Granger are entitled to good faith immunity. I find nothing in their actions to suggest any knowing or negligent violation of the plaintiffs' constitutional rights. Mr. Molgaard was afforded basic procedural protections; the fact that he was unsuccessful in his quest for an extension does not mean that Messrs. Ruetz and Granger acted in violation of his constitutional rights.

■ The plaintiffs assert that none of the individual defendants could have acted in good faith because all of them were aware of the *Flood* litigation, of which I took judicial notice at trial. *See Flood v. Margis,* 322 F.Supp. 1086 (E.D.Wis.1971); *reversed in part,* 461 F.2d 253 (7th Cir. 1972); 353 F.Supp. 400 (E.D.Wis.1972). The *Flood* case involved the operator of an existing mobile home park who alleged that the town of Caledonia board violated his due process rights when it refused to renew his license to operate. I reject the plaintiffs' assertion that simply because the four individual defendants were aware of the *Flood* case it automatically follows that they knowingly or negligently violated any rights of the Molgaards. *Flood* involved issues far different from the questions of entitlement presented here. In addition, the instant record is replete with the defendants' careful efforts to afford procedural safeguards to the plaintiffs.

Defendants Dandeneau and Horvath were members of the board in January, 1973. Both voted against the renewal of the conditional approval. Neither of these defendants had made any secret of their opposition to the Calvilla project; there are several examples in the record of their dislike of the project. There were three votes for the resolution at the January 15th meeting, and it passed. Both defendants were present at the July meetings; their votes were the same as Messrs. Ruetz and Granger.

My discussion of the conduct of Messrs. Ruetz and Granger at the July meetings is equally applicable to Messrs. Dandeneau and Horvath, and I need not repeat it here. As for the latter's actions at the January meetings, I have carefully considered the whole record and I find that both Mr. Horvath and Mr. Dandeneau were motivated solely by proper consideration of the merits of the Calvilla project and not by any desire to violate the plaintiffs' constitutional rights. I also find that given the difficult issues presented by the actions of the town board prior to the election of Messrs. Dandeneau and Horvath, neither reasonably could have known that altering the conditions or refusing to renew the approval would constitute a violation of the plaintiffs' constitutional rights.

## IV. CONCLUSION

It is clear from the record that Calvilla was an extensive development and that with its demise the plaintiffs lost a considerable investment. It is also clear that the actions of the town board were at times confused and disjointed. Calvilla was the plaintiffs' effort to bring to fruition a dream, in the fine tradition of the American entrepreneur. The problems that resulted stem from the need of our increasingly complex society to control development and plan for the future. The record forcefully demonstrates that the plaintiffs forged ahead with Calvilla without first meeting all the necessary requirements. It is difficult to escape the conclusion that it is harder to consummate a dream than it is to have

one. Nonetheless, the record fully establishes that the defendants made fair and full efforts to accommodate both the plaintiffs and others adversely affected by the plaintiffs' incomplete efforts. I conclude that there were no violations of the plaintiffs' constitutional rights by the defendants.

To summarize, I find that the plaintiffs had no cognizable property interest. I also find that even if an entitlement were present there was no infringement of any due process right. I further find that Cal-Oaks Corp. is not a proper party in interest to this suit, that the defendants did not meet their burden to establish waiver or estoppel, and that all of the individual defendants are entitled to immunity because of their good faith.

Therefore, IT IS ORDERED that the defendants be and hereby are found not liable to the plaintiffs.

IT IS ALSO ORDERED that this action be and hereby is dismissed.