**MOTHER GOOSE NURSERY SCHOOLS, INC., an Indiana Not-for-Profit Corporation, Plaintiff,**

v.

**Theodore L. SENDAK, Individually and as Attorney General of the State of Indiana, Defendant.**

**Civ. No. H 78–449.**

United States District Court, N.D. Indiana, Hammond Division.

June 29, 1984.

John Kappos and Hawk P.C. Kautz, Kappos & Kautz, Merrillville, Ind., for plaintiff.

George B. Huff, Jr., Deputy Atty. Gen., Indianapolis, Ind., Gilbert F. Blackmun, Friedrich, Bomberger, Tweedle & Blackmun, Highland, Ind., for defendant.

## MEMORANDUM JUDGMENT AND ORDER

LEE, District Judge.

"Many controversies have raged about the cryptic and abstract words of the Due Process Clause but there can be no doubt that at a minimum they require that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Mullane v. Central Hanover Bank and Trust Co.,* 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950). The matter before the court is one such controversy which has raged over a deprivation of a property right allegedly in violation of the Due Process Clause of the Fourteenth Amendment.

In the context of cross-motions for summary judgment, the Honorable Phil M. McNagny, Jr., then a judge of this court, determined the issue of liability in this case in favor of the plaintiff and against the defendant in an order dated December 16, 1980. *Mother Goose Nursery Schools, Inc. v. Sendak,* 502 F.Supp. 1319 (N.D.Ind. 1980). At the conclusion of the order, Judge McNagny noted that the court had heard no evidence on damages and therefore ordered the parties to submit briefs on the issue and further indicated that, upon full briefing, the matter would be set for a hearing on the issue of damages. The parties duly filed the requested briefs, but Judge McNagny's illness prevented the court from setting the promised hearing and precluded the court from assessing damages at the anticipated time.

A damage hearing was eventually held by the undersigned. At the conclusion of the hearing this court ordered the parties to submit post-hearing briefs. These briefs have been received and accordingly the court is in a position to determine the amount of damages to be awarded to plaintiff in this action. Prior to the assessment of damages, however, the court will address certain arguments relating to liability raised again by the defendant, through his

brief and argument, in the damage phase of this case. The court further feels compelled to raise, *sua sponte*, an issue only touched upon, if at all, in Judge McNagny's order, which has received much attention recently. That issue relates to whether or not a deprivation within the meaning of the Due Process Clause of the Fourteenth Amendment occurred so that the complaint states a justiciable cause of action under 42 U.S.C. § 1983.

### I

Because it has a bearing upon the ultimate disposition of this case, a review of the background underlying this controversy is necessary.

The plaintiff, Mother Goose Nursery Schools (hereinafter Mother Goose), is a not-for-profit organization[1] incorporated in the State of Indiana and has been licensed as a day care nursery from 1954 to the present. The defendant, Theodore L. Sendak, is the former Attorney General of the State of Indiana.

A dispute arose between these parties in September of 1978 when Sendak, then the Attorney General of Indiana, refused to approve as to "form and legality" a contract between plaintiff and the Indiana State Department of Public Welfare. Such

refusal, Judge McNagny ruled, violated plaintiff's constitutional rights and consequently rendered defendant liable under 42 U.S.C. § 1983.[2]

The events leading to the ruling by this court were based upon the following scenario. Beginning in November of 1975, Mother Goose entered into three yearly contracts[3] with the Indiana Department of Public Welfare for the provision of day care services and transportation to children of families participating in the Aid to Families with Dependent Children (AFDC) program. (Title XX). The last of these contracts expired on June 30, 1978. At that time another proposed contract between plaintiff and the Indiana State Department of Public Welfare for the period from July 1, 1978 to June 30, 1979 was submitted to defendant for his approval. Under Indiana law, all contracts entered into by public agencies such as the State Department of Public Welfare must be approved by the Attorney General "as to form and legality." Ind.Code § 4–13–2–14.[4] Defendant did not take any action on this matter until September 26, 1978 when he wrote a letter to the Governor of Indiana stating that he refused to approve the subject contract because Mr. Anthony Cifaldi, President and Director of Mother Goose, was twice con-

---

**1.** Indiana has a Not-for-Profit Corporation Act which is codified at I.C. 23–7–1.1–1, *et seq.* The Act allows for reasonable compensation to the members of the corporation as follows:

(c) No corporation shall, by any implication or construction possess the power of engaging in any activities for the purpose of or resulting in the pecuniary remuneration to its members as such, *but this provision shall not prohibit reasonable compensation to members for services actually rendered; nor shall the corporation be prohibited from engaging in any undertaking for profit so long as such undertaking does not inure to the profit of its members.*

I.C. 23–7–1.1–4 (1980) (emphasis added).

**2.** In pertinent part, 42 U.S.C. § 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the dep-

rivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

**3.** The contracts for the years 1973, 1975 and 1977 were attached as exhibits to plaintiff's Motion for Summary Judgment of March 14, 1980 (Record, at 27, Exhibits 37–39). Those contracts were all "approved" by defendant Sendak.

**4.** In pertinent part, the statute reads:

All contracts and leases *shall be approved as to form and legality* by the attorney general. The attorney general or a deputy designated by him shall approve any contract or lease submitted to him under this chapter unless he finds that it does not meet the conditions of this chapter and shall detail in writing to the administrative body or chief executive officer of the agency or department involved the specific respects in which the proposed agreement fails to meet the requirements of law. I.C. 4–13–2–14 (emphasis added).

victed of making false statements on his income tax returns.[5]

On October 1, 1978, after receipt of a letter from the Administrator of the Indiana Department of Public Welfare requesting that he resign from his position with Mother Goose, Cifaldi tendered his resignation. The Board of Directors of plaintiff corporation advised the Administrator that they had accepted Cifaldi's resignation. In spite of this information, the contract was never approved, nor was plaintiff informed of any reason for this refusal after Cifaldi's resignation.

On November 21, 1978, plaintiff filed its complaint in this court. In the order dated December 16, 1980, Judge McNagny found defendant's refusal of the subject contract to be outside of the scope of his authority and contrary to law. Judge McNagny was further of the view that this unlawful act deprived plaintiff of its constitutional right to contract and that defendant's failure to hold a hearing and give plaintiff an opportunity to confront the charges violated plaintiff's constitutional right to procedural due process. The court found that, because defendant was acting outside the law,[6] he was not entitled to immunity and therefore, damages would be a proper remedy under 42 U.S.C. § 1983.

## II

Before discussing the arguments about liability raised by the defendant in his posthearing brief the court will address, *sua sponte*, the United States Supreme Court decision in *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). At least two reasons exist for analyzing *Parratt*. First, that undeniably was a landmark decision addressing the process due for a deprivation of a property right under the Fourteenth Amendment within the context of a section 1983 action. Since Judge McNagny ruled that plaintiff was deprived of a property interest without being afford-

ed due process, and since Judge McNagny did not have the benefit of *Parratt*, a review of that case and its rapidly escalating progeny seems appropriate. Second, because of the *Parratt* decision, some doubt was cast upon the continued validity of Judge McNagny's ruling by the United States Court of Appeals for the Seventh Circuit decision in *Flower Cab Co. v. Pettitte*, 685 F.2d 192 (7th Cir.1982). There, Judge Posner, on a petition for rehearing, wrote:

> When the motion to stay the preliminary injunction was filed with this court, the appellees, in opposing the motion, did not cite a single case in support of their position. In their motion to vacate they have overcorrected this omission by citing a large number of cases. One, *Mother Goose Nursery Schools v. Sendak*, 502 F.Supp. 1319 (N.D.Ind.1980), though distinguishable on its facts, supports their petition. But since it is a district court decision, rendered before *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) (the principal basis of our opinion in this case), it is not substantial authority in their favor.

*Id.* at 195. Thus, this court concludes that Judge McNagny's order should be reassessed in light of *Parratt*. If the doctrine espoused in *Parratt* precludes plaintiff's claimed deprivation of a property right under section 1983, plaintiff's prayer for damages must, as a consequence, fail because of the lack of a cognizable federal claim.

In *Parratt*, a Nebraska prison inmate ordered a $23.50 hobby kit through the mails. The hobby kit was lost after it reached the prison. The inmate filed a § 1983 suit against the Warden and "hobby manager" of the prison alleging that they were negligent in allowing the hobby kit, contrary to prison policies, to be signed for and delivered to persons other than the inmate who ordered it. The district court held that by negligently failing to follow

---

**5.** It appears that Mr. Cifaldi was convicted of income tax evasion in federal court in 1972. The same facts provided the foundation for a state court conviction in 1977.

**6.** *See, e.g., Procunier v. Navarette*, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978); *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975).

their own regulations, the prison officials had deprived the inmate of his property without due process of law. On this basis, the district court granted plaintiff's motion for summary judgment and this decision was affirmed by the Eighth Circuit Court of Appeals, 620 F.2d 307 (8th Cir.1980). On review, the Supreme Court reversed and dismissed the inmate's complaint, 451 U.S. at 544, 101 S.Ct. at 1917. In doing so, the Supreme Court analyzed two troublesome areas in section 1983 litigation: the state of mind requirement of the actors and the exhaustion of remedies. After determining that section 1983 covers negligent as well as intentional deprivations and that exhaustion of remedies is not generally a prerequisite to suit in federal court under that statute, the Supreme Court in *Parratt* indicated that analysis of a claim under section 1983 must focus upon whether or not the essential elements of a cause of action under that statute exists:

> Accordingly, in any § 1983 action the initial inquiry must focus on whether the two essential elements to a § 1983 action are present: (1) whether the conduct complained of was committed by a person acting under color of state law; and (2) whether this conduct deprived a person of rights, privileges, or immunities secured by the Constitution of the United States.

451 U.S. at 535, 101 S.Ct. at 1913.

■ In this case, the first element set forth in *Parratt* clearly exists. There can be no doubt but that the activities of defendant constituted action "under color of state law." Even defendant does not dispute that the deprivation of which plaintiff complains was pursuant to a decision made by one, here the Attorney General of Indiana, clothed with the authority of the state. Nor could such a dispute be seriously made for it is a "misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law", that constitutes "action taken 'under color of state law.'" *United States v. Classic,* 313 U.S. 299, 326, 61 S.Ct. 1031, 1043, 85 L.Ed. 1368 (1941); *accord Lugar v. Edmondson Oil Co., Inc.,*

457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982).

The second element for a cause of action under section 1983 as set forth in *Parratt* also exists in this case though its existence is not as clear. As indicated, the Supreme Court in *Parratt* stated that in order for a cause of action to lie under section 1983, it must be shown, aside from the fact that the action was under color of state law, that the activity complained of deprived a person of a right, liberty, privilege or immunity secured by the constitution or laws of the United States. 451 U.S. at 535, 101 S.Ct. at 1913. The Court in *Parratt* further noted that where, as here, the party is seeking to establish a due process claim under the Fourteenth Amendment in order to satisfy the second element, the claimant must show: (1) the existence of a property right; (2) that the alleged loss of that property amounted to a deprivation; and (3) that the deprivation of the property right occurred "without due process of law." *Id.* at 536–37, 101 S.Ct. at 1913–14, *quoting Baker v. McCollan,* 443 U.S. 137, 145, 99 S.Ct. 2689, 2695, 61 L.Ed.2d 433 (1979).

■ "Property rights, of course, are not created by the Constitution." *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). "Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlements to such benefits." *Id.* "A person's interest in a benefit is a 'property' interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit ...". *Perry v. Sindermann,* 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972). Thus, to have a property interest in a benefit, a person "must ... have a legitimate claim of entitlement to it." *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709.

Unquestionably, defendant's action in this case deprived plaintiff of a property

right. As the above quotations point out, "the standard the Court has developed is one of 'cause,' if the plaintiff can assert that he has a 'legitimate claim of entitlement' not to lose a valuable governmental benefit except for cause, then the plaintiff has asserted a 'property' interest." *Begg v. Moffitt*, 555 F.Supp. 1344, 1348 (N.D.Ill. 1983). Plaintiff's legitimate expectation of a benefit was explained by Judge McNagny is his order on liability thusly:

> The plaintiff in this case had a legitimate expectation that the contract would be approved. The contract was proper in form and content, and similar contracts had been approved in the past. All the details had been worked out between the parties to the contract. The Attorney General was not a party to the contract and had no authority to contest the contract on the grounds that he thought the plaintiff should not be licensed to provide day care services. This job belonged to another agency of the state. The plaintiff had a legitimate claim of entitlement under Indiana statutes that the contract be approved summarily. The plaintiff was denied this claim without any opportunity to contest the matter.

502 F.Supp. at 1325.

Thus far, the analysis has not proved troublesome. It is clear that plaintiff was deprived of a property interest to which it had a legitimate entitlement by one acting "under color of state law." There remains, however, the question of whether that deprivation was without due process of law.

■ "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976), *quoting Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965). And in this vein, the Supreme Court "consistently has held that some form of hearing is required before an individual is *finally* deprived of a property interest." *Eldridge, supra* 424 U.S. at 333, 96 S.Ct. at 902 (emphasis added); *see*

*also Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

It is the notion that one may not finally be deprived of a property interest without due process of law which lies at the core of the Supreme Court decision in *Parratt*. Recognizing that the Constitution requires that a hearing be provided before a claimant is *finally* deprived of a protected interest the Court held that the inmate whose hobby kit was lost could expect full redress in a post-deprivation hearing for such a hearing would provide a "meaningful opportunity" to regain the property or its equivalent. 451 U.S. at 540–41, 544, 101 S.Ct. at 1915–16, 1917; *see, e.g., Mitchell v. W.T. Grant Co.*, 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974).

But the post-deprivation hearing found to be consonant with due process in *Parratt* is not to be accorded a doctrinaire application. The majority opinion in *Parratt* recognized as much in reviewing its prior holdings on the issue. The Court wrote that in most cases where it had held that due process required a hearing, "the deprivation of property was pursuant to some established procedure and 'process' could be offered before any actual deprivation took place." *Parratt*, 451 U.S. at 537, 101 S.Ct. at 1914; *see, e.g., Mullane*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865. The Court further stated, however, that in certain circumstances, a post-deprivation hearing could provide due process:

> [We] recognize that either the necessity of quick action by the State or the impracticality of providing any meaningful predeprivation process can, when coupled with the availability of some meaningful means by which to assess the propriety of the State's action at some time after the initial taking, satisfy the requirements of procedural due process.

451 U.S. at 539, 101 S.Ct. at 1915 (footnote omitted). Since the deprivation suffered by Taylor in not receiving the hobby kit was not the result of some established state procedure, but, instead, occurred because of the guard's failure to follow established state procedure, a post-deprivation hearing

in the form of a state court action satisfied the Due Process Clause of the Fourteenth Amendment.

█ The import of *Parratt* then may be said to be that a distinction exists between random activities by state officials on the one hand, and failure of state officials to follow established procedures on the other hand. In the former case, a post-deprivation hearing, even in the form of a state tort remedy, suffices, while in the latter case, only a pre-deprivation hearing would satisfy the Due Process Clause of the Fourteenth Amendment. Indeed, the oft-cited concurring opinion of Justice Blackmun in *Parratt* suggests that that distinction is exactly what the majority had in mind:

Most importantly, I do not understand the Court to suggest that the provision of "post-deprivation remedies," *ante* [101 S.Ct.], at 1914, within a state system would cure the unconstitutional nature of a state official's intentional act that deprives a person of property. While the "random and unauthorized" nature of negligent acts by state employees makes it difficult for the State to "provide a meaningful hearing before the deprivation takes place," *ante*, at 1916, it is rare that the same can be said of intentional acts by state employees. When it is possible for a State to institute procedures to contain and direct the intentional actions of its officials, it should be required, as a matter of due process, to do so. See *Sniadach v. Family Finance Corp.*, 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969); *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). In the majority of such cases, the failure to provide adequate process prior to inflicting the harm would violate the Due Process Clause. The mere availability of a subsequent tort remedy before tribunals of the same authority that, though its employees, deliberately inflicted the harm complained of, might well not provide the due process of which the Fourteenth Amendment speaks.

*Id.* at 545–6, 101 S.Ct. at 1918 (Blackmun, J., concurring). And, the post-*Parratt* decision of the Supreme Court in *Logan v. Zimmerman Brush*, 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982), indicates that the distinction is not without a difference.

In *Logan*, plaintiff filed a charge of employment discrimination with the Illinois Fair Employment Practice Commission. Due to negligence on its part, the Commission failed to convene a factfinding conference within one hundred twenty days as required by law. Logan's claim was dismissed and the Illinois Supreme Court affirmed the dismissal finding that the failure to hold the conference within the one hundred twenty day period deprived the Commission of jurisdiction. On certiorari to the United States Supreme Court, the company argued that since Logan could receive due process in the form of a state hearing, his due process claim was barred by the holding in *Parratt*. The Supreme Court rejected that reading of *Parratt*:

This argument misses *Parratt's* point. In *Parratt*, the Court emphasized that it was dealing with "a tortious loss of ... property as a result of a random and unauthorized act by a state employee ... not a result of some established state procedure." 451 U.S., at 541, 101 S.Ct., at 1915. Here, in contrast, it is the state system itself that destroys a complainant's property interest, by operation of law, whenever the Commission fails to convene a timely conference—whether the Commission's action is taken through negligence, maliciousness, or otherwise. *Parratt* was not designed to reach such a situation. See *id.*, at 545, 101 S.Ct., at 1918 (second concurring opinion). Unlike the complainant in *Parratt*, Logan is challenging not the Commission's error, but the "established state procedure" that destroys his entitlement without according his proper procedural safeguards.

In any event, the Court's decisions suggest that, absent "the necessity of quick action by the State or the impracticality of providing any predeprivation

process," a postdeprivation hearing here would be constitutionally inadequate. *Parratt,* 451 U.S., at 539, 101 S.Ct., at 1915.

102 S.Ct. at 1158.

The distinction between "random and unauthorized activity" and "failure to follow established state procedure" leads directly back to the reason for discussing *Parratt* in the context of this case. It also leads, at least apparently, to the basis for Judge Posner's distinction of Judge McNagny's ruling on liability in *Flower Cab, supra.* If defendant Sendak's activity is deemed to be merely a random and unauthorized activity on his part, then a post-deprivation tort remedy (or perhaps mandamus action) would satisfy due process. If, however, defendant's action amounted to a failure to follow established state procedure, a pre-deprivation hearing would be necessary.

■ "What then is the significance of the distinction drawn in *Parratt* and *Logan* between 'random and unauthorized' conduct and conduct pursuant to 'an established state procedure'?" *Begg,* 555 F.Supp. at 1360. In response to this rhetorical question, Judge Prentice H. Marshall, in a lucid opinion, wrote:

To answer this question, we think it essential to examine the context in which the *Parratt* Court adverted to the random and unauthorized nature of the conduct at issue there. The Court observed that when conduct is random and unauthorized, it is impracticable to provide any type of notice and hearing prior to the conduct.

The justifications which we have found sufficient to uphold taking of property without any predeprivation process are applicable to a situation such as the present one involving a tortious loss of a prisoner's property as a result of a random and unauthorized act by a state employee. In such a case, the loss is not a result of some established state procedure and the State cannot predict precisely when the loss will occur. It is difficult to conceive of how the State could provide a meaningful hearing before the deprivation takes place. The loss of property, although attributable to the State as action under "color of law," is in almost all cases beyond the control of the State. *Indeed, in most cases it is not only impracticable, but impossible to provide a meaningful hearing before the deprivation.*

*Parratt,* 451 U.S. at 541, 101 S.Ct. at 1915 (emphasis supplied).

The Court concluded that Parratt was a case with no "contention that it was practicable for the state to provide a predeprivation hearing." *Id.* at 543, 101 S.Ct. at 1916. Since the only claim Taylor had forwarded was the right to a predeprivation hearing, it was inevitable that the Court would conclude that since that state simply could not have provided a predeprivation hearing, due process, not requiring the impossible, would be satisfied by a postdeprivation hearing in the Nebraska state courts.

*Id.* (footnote omitted). This court is in accord with the foregoing analysis being of the view that the requirement for a predeprivation hearing is, in essence, one of practicality. In those situations where a pre-deprivation hearing is impractical, either because of exigency or because of impossibility, it is incongruous to require that a state afford a hearing under the guise of the Fourteenth Amendment. That amendment only requires that a person receive due process of law and, the process due, of necessity, varies with the facts of each case. After all, " '[d]ue process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances," *Cafeteria Workers v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961), but rather "due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).

■ Clearly, defendant's activity in this case was not the result of some random

unauthorized action, but was the result of defendant's willful failure to follow established state procedure. True, defendant's activity was unauthorized in the sense that he did not follow the statutory requirement just as the Illinois Fair Employment Practices Commission in *Logan* failed to conduct a factfinding conference within one hundred twenty days as required by law. But defendant Sendak knew full and well that his authority to reject the contract was confined to its "form and legality." His sole function was to review the contract and pass upon its facial validity. No authority existed to look behind the contract to the applicant's background particularly, where as here, the applicant was a corporation and not the alter ego of Anthony Cifaldi. That a pre-deprivation hearing could and should have occurred is undeniable.

As the recitation of facts makes clear, the contract languished in Sendak's office for many months. After defendant saw fit to reject to contract, albeit on impermissible grounds, by writing a letter to the Governor, Anthony Cifaldi resigned as director of plaintiff corporation as a result of a letter he received from the Administrator of the Indiana Department of Public Welfare. Yet during this entire episode plaintiff corporation was never informed of the reasons for rejection—for all it knew, the contract may have been rejected on the grounds that it did not meet the requirement of form and legality. Even after Cifaldi tendered the requested resignation, the contract was not approved nor was plaintiff informed of any reason for non-approval. In this respect, "the state has failed to provide due process precisely because the only remedy available has come after the deprivation has occurred." *Begg, supra* at 1362. "By failing to provide the requisite predeprivation hearing, the state official [here defendant Sendak] has deprived the plaintiff of a constitutionally protected interest without due process of law and the four elements of a § 1983 due process action described in *Parratt* are complete." *Id.*

So what then of the United States Court of Appeals' decision in *Flower Cab?* The answer is unclear. While Judge Posner wrote that *Mother Goose v. Sendak* was not substantial authority because of the fact that it was a district court decision which preceded *Parratt, Flower Cab* was before the court on a motion to stay an injunction. True, the court noted that it was a "doubtful proposition that every failure—even every deliberate refusal—of state or city officials to comply with ministerial duties gives rise to a claim under the constitution" and that the "case probably comes within the principle of *Parratt v. Taylor* ...". 685 F.2d at 193. But the discussion relating to *Parratt* was mere surplusage: "[i]t goes without saying that all of our legal and evidentiary observations are tentative, based as they are on the very incomplete record before us on this motion for a stay and the short time that we have had to act on the motion." *Flower Cab, supra* at 194. In fact, at least one subsequent decision of the United States Court of Appeals for the Seventh Circuit recognized the tentative nature of *Flower Cab* and in doing so reiterated the distinction, recognized in *Parratt,* between "random and unauthorized acts" and those "resulting from established state procedure." *Evans v. City of Chicago,* 689 F.2d 1286, 1298 (7th Cir.1982).

The court recognizes, as the foregoing is intended to make clear, that the law with respect to procedural due process claims brought under 42 U.S.C. § 1983 is in a state of flux. Notwithstanding the uncertainty in this area, the court is convinced that plaintiff's claims allege a cause of action under the Civil Rights Act of 1871 which is not precluded by the United States Supreme Court's decision in *Parratt v. Taylor.*

### III

Having concluded that *Parratt* does not bar plaintiff's claim, there remains the question of the amount of damages to be assessed in this case. Prior to reaching that issue, however, the court need address the arguments on liability raised by the

defendant in both his damage brief and during the damage hearing.

Despite this court's December 16, 1980 ruling that damages would be appropriate, defendant, in its January 7, 1981 brief on damages, contends that monetary damages are not appropriate for several reasons. In this vein, defendant raises absolute and qualified immunity as a defense to damages. These claims, however, were addressed and rejected in the December 16, 1980 ruling (of which more will be said below). Alternatively, defendant claims that an award of damages would violate the Eleventh Amendment. This claim, while implicitly but not specifically addressed in Judge McNagny's ruling, is nonetheless without merit. After briefly commenting upon the immunity claim, this court will address defendant's Eleventh Amendment claim.

In rejecting the immunity claims, Judge McNagny wrote:

It should be noted that in *Citizens Energy Coalition of Indiana v. Sendak,* 459 F.Supp. 248, 258 (S.D.Ind.1978), the court stated that, "The Attorney General, acting in his quasi-judicial capacity, is immune from liability for monetary damages. However, this immunity does not extend to injunctive relief." This Court cannot agree with this statement. "Historically, damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty." *Bivens v. Six Unknown Federal Narcotics Agents,* 403 U.S. 388, 395 [91 S.Ct. 1999, 2004, 29 L.Ed.2d 619] (1971). "In situations of abuse, an action for damages against the responsible official can be an important means of vindicating constitutional guarantees." *Butz v. Economou,* 438 U.S. 478, 505 [98 S.Ct. 2894, 2910, 57 L.Ed.2d 895] (1978). Injunctive relief would afford little remedy to the injured parties in this case. The harm took place more than two years ago. "Injunctive or declaratory relief is useless to a person who has already been injured." *Id.* at 504 [98 S.Ct. at 2910].

*Mother Goose Nursery Schools, Inc. v. Theodore Sendak,* 502 F.Supp. at 1323. The foregoing decision with respect to immunity was written at a time when the state of the law with respect to qualified immunity permitted the court to consider both an objective and subjective aspect with respect to the executive official's conduct. The objective element invoked a presumption that an official would have knowledge of and respect for "basic, unquestioned constitutional rights," *Wood v. Strickland,* 420 U.S. 308, 320, 95 S.Ct. 992, 999, 43 L.Ed.2d 214 (1975), while the subjective component referred to "permissible intentions," *id.,* whereby taken together, a claimed qualified immunity would be defeated if the official "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff], or if he took the action with malicious intention to cause a deprivation of constitutional rights or other injury ...". *Id.* at 321–22, 95 S.Ct. at 1000–01.

It was within this jurisprudential framework that Judge McNagny penned his December 16, 1980 decision. But that framework was subsequently altered by the United States Supreme Court decision in *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

In *Harlow,* the United States Supreme Court revamped its prior decisions relating to qualified immunity by holding that such a claim (the affirmative defense that it is, *see Gomez v. Toledo,* 446 U.S. 635, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980)), could be sustained solely upon a showing of objective good faith because "[t]he subjective element of the good faith defense frequently has proved incompatible with our admonition in *Butz* [*v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978)] that insubstantial claims should not proceed to trial." *Harlow,* 457 U.S. at 817, 102 S.Ct. at 2737.

Since subjective good faith was generally a question for the jury, *see, e.g., Landrum v. Moats,* 576 F.2d 1320, 1329 (8th Cir. 1978); *Duchesne v. Sugarman,* 566 F.2d

817, 832–33 (2d Cir.1977), and jury questions by definition are not susceptible to resolution in a summary fashion (as per Fed.R.Civ.P. 56), many claims, otherwise unwarranted, necessitated a complete trial. And since the avowed purpose of qualified immunity is to "avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment," *Harlow*, 457 U.S. at 819, 102 S.Ct. at 2739, the objective/subjective scenario was unworkable in many cases because "[j]udicial inquiry into subjective motivation [could] entail broad ranging discovery and the deposing of numerous persons, including an official's professional colleagues [which could be] peculiarly disruptive of effective government." *Id.* at 818, 102 S.Ct. at 2738. Rather than subject an official to such disruptive effects, it was adjudged by the United States Supreme Court in *Harlow*,

> that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. See *Procunier v. Navarette*, 434 U.S. 555, 565, 98 S.Ct. 855, 861, 55 L.Ed.2d 24 (1978); *Wood v. Strickland, supra,* 420 U.S. at 321, 95 S.Ct. at 1000.

*Id.* (footnote omitted).

The change that *Harlow* brought to the law does not convince this court that Judge McNagny's decision with respect to qualified immunity in this case was incorrect. To the contrary, while Judge McNagny may have spoken in terms of the then prevailing subjective/objective analysis, his ultimate holding vis-a-vis defendant Sendak's liability appears to be drafted in terms of that defendant's objective knowledge. As stated in Judge McNagny's December 16, 1980 order:

> Thus, the Attorney General *acted beyond and outside of the law in not*

accepting the contract in issue and should have realized that he was not doing so. *In fact, the defendant in this case had no authority to exercise his discretion in the first place.* "He has a mandatory duty to approve all contracts which are lawful as to form and content."

502 F.Supp. at 1323, *quoting Citizens Energy Coalition*, 594 F.2d 1158, 1162 (7th Cir.1979). Thus, it appears clear from Judge McNagny's December 16, 1980 order that the defendant objectively knew that his action was outside his authority and was therefore—by objective standards—beyond his authority as Attorney General. Given such a conclusion, there remains as a sole safeguard defendant's claimed Eleventh Amendment immunity to the award of damages.

With respect to the Eleventh Amendment, defendant claims that an award of damages would impose a liability which must be paid from public funds in the state treasury and thereby violate the Eleventh Amendment as explicated in *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) and *Quern v. Jordan*, 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979). Defendant is correct insofar as *Edelman*, reiterates the proscriptions of the Eleventh Amendment. As explained by the Supreme Court: "In a § 1983 action ... a federal court's remedial power consistent with the Eleventh Amendment is necessarily limited to prospective injunctive relief, *Ex Parte Young* [209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908)], [citation omitted], and may not include a retroactive award which requires the payment of funds from the state treasury, *Ford Motor Co. v. Department of Treasury*, [citation omitted]." 415 U.S. at 677, 94 S.Ct. at 1362.[7] And the Eleventh Amendment may serve as a bar even though the state is not specifically named as a party because "[i]ts applicability 'is to be determined not by the mere names of the titular parties but by

---

7. Indiana has specifically rejected any waiver of this Eleventh Amendment protection. *See* I.C. 34–4–16.7–3.

the essential nature and effect of the proceeding, as it appears from the entire record.' " *Scheuer v. Rhodes,* 416 U.S. 232, 239, 94 S.Ct. 1683, 1687, 40 L.Ed.2d 90 (1974), *citing Ex Parte New York,* 256 U.S. 490, 500, 41 S.Ct. 588, 590, 65 L.Ed. 1057 (1921). Thus "when the action is in essence one for recovery of money from the state, the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity." *Ford Motor Co. v. Department of Treasury,* 323 U.S. 459, 65 S.Ct. 347, 89 L.Ed. 389 (1945).

In reliance upon the above stated proposition, defendant argues that because of the Eleventh Amendment prohibition, relief can only be in the form of a prospective injunction and that therefore, plaintiff's section 1983 remedy has already been granted in the nature of declaratory relief. This argument, however, is unpersuasive for it misinterprets the import of the litigation presently pending before this court.

It is altogether clear that in this action plaintiff seeks damages against defendant in his person, not against the office of the Attorney General. Moreover, Judge McNagny has already found "that the defendant, Theodore Sendak, is liable to the plaintiff for a violation of its constitutional rights." *Mother Goose Nursery Schools,* 502 F.Supp. at 1326. Essentially, the issue of individual liability has been ruled upon and it is clear that damages, in some circumstances against state officials in their individual capacity, is an appropriate remedy for violations under 42 U.S.C. § 1983. In *Scheuer v. Rhodes,* the United States Supreme Court though recognizing the doctrine of *Ex Parte Young,* reversed the dismissal of claims against the defendant-governor on Eleventh Amendment grounds, stating:

> *Ex parte Young,* like *Sterling v. Constantin,* 287 U.S. 378, 53 S.Ct. 190, 77 L.Ed. 375 (1932), involved a question of the federal court's injunctive power, not, as here, *a claim for monetary damages. While it is clear that the doctrine of Ex parte Young is of no aid to a plaintiff seeking damages from the public trea-

*sury, Edelman v. Jordan, supra; Kennecott Copper Corp. v. State Tax Comm'n,* 327 U.S. 573, 66 S.Ct. 745, 90 L.Ed. 862 (1946); *Ford Motor Co. v. Dept. of Treasury,* 323 U.S. 459, 65 S.Ct. 347, 89 L.Ed. 389 (1945); *Great Northern Life Insurance Co. v. Read,* 322 U.S. 47, 64 S.Ct. 873, 88 L.Ed. 1121 (1944), damages against individual defendants are a permissible remedy in some circumstances notwithstanding the fact that they hold public office. Myers v. Anderson,* 238 U.S. 368, 35 S.Ct. 932, 59 L.Ed. 1349 (1915). See generally *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); *Moor v. County of Alameda,* 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973).

*Scheuer,* 416 U.S. at 237–238, 94 S.Ct. at 1687 (emphasis added). The Supreme Court went on to note that "[i]n some situations a damage remedy can be as effective a redress for the infringement of a constitutional right as injunctive relief might be in another." *Id.* This court, by order of December 16, 1980, has already found that just such circumstances exist here. As stated by Judge McNagny:

> The plaintiff's rights to contract and due process rights were violated by the defendant in this case. *As a result of these violations the plaintiff has been forced to suffer harm which can only be remedied by remuneration.*

*Mother Goose,* 502 F.Supp. at 1326 (emphasis added). *See also Scott v. Plante,* 641 F.2d 117, 133 (3d Cir.1981); *Wong v. Calvin,* 87 F.R.D. 145 (N.D.Fla.1980). On the basis of the foregoing, this court is of the view that the Eleventh Amendment does not bar an award of monetary damages in the present matter. Consequently, this court must now assess damages.

IV

The seminal case with respect to an award of damages for violation of constitutional rights is, of course, the United States Supreme Court decision in *Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). In *Carey,* elementary

and secondary students brought suit against a school board claiming that they had been suspended from school without procedural due process because they were not provided an opportunity to be heard prior to the suspension. The district court found that the students' rights had been violated, but disallowed an award of damages. The Seventh Circuit Court of Appeals reversed, indicating that if liability for the violation of a constitutional right is established, "[t]he amount fixed by the District Court should be neither so small as to trivialize the right nor so large as to provide a windfall." *Piphus v. Carey,* 545 F.2d 30, 32 (7th Cir.1976). The Supreme Court granted certiorari "to consider whether in an action under § 1983 for the deprivation of procedural due process, a plaintiff must prove that he actually was injured by the deprivation before he may recover substantial 'non punitive' damages." *Carey,* 435 U.S. at 253, 98 S.Ct. at 1047. In deciding the issue presented, the Supreme Court indicated that, like the common law rules of damages, three types of damages are possible for deprivations of constitutional rights—nominal, compensatory and punitive. As stated by the Court:

> Common-law courts traditionally have vindicated deprivations of certain "absolute" rights that are not shown to have caused actual injury through the award of a nominal sum of money. By making the deprivation of such rights actionable for nominal damages without proof of actual injury, the law recognizes the importance to organized society that those rights be scrupulously observed; but at the same time, it remains true to the principle that substantial damages should be awarded only to compensate actual injury or, in the case of exemplary or punitive damages, to deter or punish malicious deprivations of rights.

*Id.* at 266, 98 S.Ct. at 1053–54.

In the present matter, both parties recognize the possibility of these three types of damages. Quite understandably, defendant suggests that only nominal damages should be allowed because there exists no element of bad faith. Plaintiff, on the other hand, asserts that because actual injury is quantifiable, substantial damages should be assessed.

 This court is of the view that nominal damages are not appropriate in the case at bar. In reaching this conclusion, the court is guided by the following considerations. Nominal damages as recognized in *Carey* are applicable where a procedural due process right has been violated and there exists no showing of actual injury. *See Owen v. Lash,* 682 F.2d 648 (7th Cir. 1982). Here plaintiff complains of actual injury. Moreover, Judge McNagny already found defendant's action violated plaintiff's right to contract and that only remuneration would compensate that loss. Further, the fact that compensatory damages may be appropriate for violations of a substantive constitutional right even absent a showing of actual injury only adds to the conclusion that present plaintiff is entitled to more than nominal damages. *See Owen v. Lash, supra* at 657–58.[8] Having concluded that nominal damages would minimize the nature of the deprivation, this court must focus upon compensating plaintiff for the injury incurred.

 To place the assessment of damages in the proper perspective, this court is guided by the principle espoused in *Carey, supra,* that the common law tort rules of damages should guide the court in fashioning the damage award to compensate for constitutional torts. *Carey, supra* 435 U.S. at 257–58, 98 S.Ct. at 1049. Concomitantly, this court recognizes that federal law, rather than state law, governs such an award of damages. *See Busche v. Burkee,* 649 F.2d 509, 518 (7th Cir.1981). These principles, taken together, allow this

**8.** As noted by the Seventh Circuit in *Owen, supra,* the question of whether or not more than nominal damages is appropriate upon the showing of a *substantive* violation, absent actual injury, is a question which has yet to be addressed in this Circuit. *See Owen, supra,* at 657–659. Since the present matter involves a showing of actual injuries, that question need not be resolved.

court to draw upon federal law and the common law of the several states to fashion a remedy that is responsive to the injury. *See Sullivan v. Little Hunting Park, Inc.,* 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969).

■ In the case at bar, this court has concluded that defendant's wrongful conduct interfered with plaintiff's contract, or at the very least, its expected contract with the Indiana State Department of Public Welfare. Defendant emphasizes that without his approval, the contract was not enforceable and thus plaintiff is, at best, seeking to recover for its expectation of receiving· the subject contract. This distinction in the court's view, however, is of no great moment. It is indisputable that, as a general proposition, the wrongful interference with the performance of the formation of a contract constitutes a tort for which damages may be recoverable. *See* 86 C.J.S. *Torts* § 43 (1954). "In addition, the common law has long held that the reasonable expectancy of a prospective contract is a property right to be protected from wrongful interference in the same sense as an existing contract is protected." *Leonard Duckworth, Inc. v. Michael L. Field & Co.,* 516 F.2d 952, 955 (5th Cir. 1975) (Texas law); *accord Squirt Co. v. Seven-Up Co.,* 628 F.2d 1086 (8th Cir.1980) (Missouri law); *Doft & Co., Inc. v. Home Federal Savings & Loan Ass'n.,* 592 F.2d 1361 (5th Cir.1979) (Florida law). *See also* Restatement (Second) of Torts § 766, 766B; *but see William L. Deckelbaum Co. v. Equitable Life Assurance Society of the United States,* 419 N.E.2d 228 (Ind.App. 1981).

■ It is altogether clear that present plaintiff had an abundantly reasonable expectation of a contract with the Indiana State Department of Public Welfare. Plaintiff had entered into consecutive contracts in earlier years with that department. All had been routinely approved by the defendant and performed by the Department of Public Welfare. Further, it is clear that a time lag between submission and approval was both inevitable and ex-

pected. In short, this is not a case where the parties had only begun tentative negotiations; both parties to the contract (plaintiff and the Welfare Department) had agreed to the terms and signed the contract. It was entirely reasonable that both were expecting—as in the past—another routine approval by defendant Sendak.

Because it was entirely reasonable for plaintiff to perform as if the contract was in effect, the court is of the view that certain damages are in order. At the September 29, 1981 hearing, plaintiff presented evidence of various types of damages, including: (1) losses for services rendered; (2) interest paid on loans; (3) expected profits for contract year 1978–1979; (4) expected profit losses for future years; (5) losses incurred on a subordinate contract; and (6) general damages which cannot be computed.

■ Generally speaking, a court should "hold the tortfeasor responsible for all the ‹ consequences growing out of his wrongful act." *Wade v. Culp,* 107 Ind.App. 503, 23 N.E.2d 615, 619–20 (1939). "In such cases the measure of damages is the loss actually incurred." *Id.; see also Jay Clutter Custom Digging v. English,* 181 Ind.App. 603, 393 N.E.2d 230 (1979). Based upon the foregoing principle, the court is of the view that plaintiff is entitled to damages for the amount it expended for services actually rendered as well as damages to compensate for the lost profits for contract year 1978–1979. The court is further of the view, however, that plaintiff's other claims for damages should not be allowed.

■ With respect to the amount actually expended by plaintiff, it was made indisputably clear at the hearing. on damages that plaintiff expended $20,715.00— from July through some time in September of 1978—with the expectation that, as before, the contract would be renewed. (Transcript on Damages, pp. 16–18). That is, having had several years of dealing with these types of contracts and recognizing that the contracts were always late in coming back from the Attorney General, plain-

tiff (even though it had no approved contract) provided the services required under the contract and expected to be reimbursed when defendant approved it. The undisputed testimony of Anthony Cifaldi made clear that vouchers were submitted in the amount of $20,715.00 for services rendered but were never paid by the state and remain unpaid to date. (*See* Transcript on Damages, p. 11). Thus, though plaintiff had billed $20,715.00 for services to Title XX contract children, it was never reimbursed for those services. Accordingly, it is clear that plaintiff should recover from defendant for those expenses.[9]

Plaintiff shall also recover its expected profits for contract year 1978–1979. This is so because "lost profits can ... be a proper measure of damages for breach of contract." *Lee v. Joseph E. Seagram & Sons, Inc.*, 552 F.2d 447, 455 (2d Cir.1977). As was stated in *Standard Machinery Co. v. Duncan Shaw Corp.*, 208 F.2d 61, 64 (1st Cir.1953);

> "Certainly no authority need be cited for the broad proposition that prospective profits, if proved, are an element of a plaintiff's damages for breach of contract, or for the further proposition that evidence of past profits from an established business provides a reasonable basis for estimating future profits from the business."

*See also Perma Research & Development Co. v. Singer*, 402 F.Supp. 881, 898 (S.D.N.Y.1975), *aff'd.*, 542 F.2d 111 (2d Cir.1976).

In the present matter, plaintiff clearly proved that it lost profits for contract year 1978–1979. In this vein, plaintiff asserts that it could be assured of a profit for Title XX (state contract students) which it could not be assured of if the places were not filled by non-contract students. As was established at the damages hearing, plaintiff operated two nursery schools, one of which was located in Gary, the other in Portage, both of which had, under law, a maximum of forty students. It was further established that students who paid their own weekly rate paid a sum of Thirty Dollars ($30.00) per week for day care services exclusive of transportation. The deal struck with the state, however, was slightly higher. For each contract student, the state agreed to pay $7.05 per day or $35.25 a week exclusive of transportation costs. Thus under the contract plaintiff expected an additional $1.05 daily for each Title XX child in its schools. Since plaintiff had forty-one contract students enrolled at the start of school year 1978–79 and since the 1978–79 school year consisted of 175 days (after subtracting the forty-three days contained in the vouchers referred to above), plaintiff is entitled to lost profits amounting to $7,533.75 for that year ($1.05 × 41 = $43.04 × 175 = $7,533.75).

Plaintiff's other claims for damages, however, are either not directly attributable to defendant's malfeasance or are not borne out by the evidence. For example, plaintiff claims that it is entitled to damages due to the denial of contract renewal for the school years of 1979–80, 1980–81 and 1981–82 in the sum total of $28,154.00. That claim, however, is speculative at best. While plaintiff may have had a good record in securing contracts with the state, it cannot be said that such contracts would continue *ad infinitum.* The fact that actual profits were contingent upon multitudinal factors (not the least of which would be other bidders)—all of which were unforeseeable by the defend-

---

**9.** As a correlative to the notion that a tortfeasor is responsible for "all losses incurred" is the fundamental requirement that the aggrieved party mitigate the damages *Wolf-Lillie v. Kenosha County Sheriff*, 504 F.Supp. 1, 9 (E.D.Wisc. 1980). In light of this, defendant lays great emphasis upon the fact that plaintiff never resubmitted the contract after Cifaldi resigned his position in plaintiff's management. However, plaintiff did advise both the Administrator of Public Welfare and the defendant that Cifaldi's resignation had been accepted by plaintiff's Board of Directors. Even given such notification, plaintiff was never thereafter requested to make further submissions nor was it informed of any reason for the non-approval of the contract after Cifaldi's resignation. In this court's view, plaintiff was not required to do more than it did in an effort to mitigate damages for in point of fact it appears that nothing more could, or should have been done.

ant—leads unerringly to the conclusion that defendant is not chargeable with any such speculative damages. Moreover, plaintiff failed to show that these lost profits were reasonably certain to accrue because it presupposed that the contract would be renewed. Given the facts of this case, that is not a supposition the court will entertain because, defendant, no less than this court, or indeed plaintiff, would not know what would, or could, happen in future years.

Similarly the court will deny plaintiff's claims for damages allegedly resulting from interest paid on loans to cover unreimbursed expenses and plaintiff's claim it lost money on a subordinate contract because of defendant's malfeasance. Plaintiff wholly failed to establish that it did in fact suffer additional damages with respect to those claims. As for the loans, Anthony Cifaldi, at the hearing on damages, testified as follows:

Q. As far as the loans were concerned, the loans were to make up for the $20,000 you didn't get from the State?

A. Yes, basically speaking.

Q. So one replaced the other?

A. I would say so.

Q. You get $20,000 from the State, you don't need the $20,000 in loans?

A. I would say so.

Q. When and if you ever got $20,000 from the State, you could use that to repay the loans and wash out that obligation?

A. Yes.

(Hearing on Damages, p. 44). Thus, by Anthony Cifaldi's own testimony, the loans were in lieu of the unpaid vouchers and were not above and beyond the amount expended.

Similarly, with respect to the subordinate contract, which was in the form of a five year lease between Anthony Cifaldi and plaintiff, Anthony Cifaldi testified as follows:

Q. So it is true, is it not, that the only actual money that the corporation is out as a result of that contract not being signed is underpayment of $20,715 from the State?

A. Well, I wouldn't look at it that way, I see incurred rentals, incurred wages.

Q. The corporation was obligated to pay its rent for five years, right?

A. Correct.

Q. It had nothing to do with your contract with the State, did it?

A. Not directly.

(Hearing on Damage, p. 45). As the above testimony makes clear, the lease was an obligation which accrued whether or not the contract was approved.[10] That is, whether or not a contract with the state existed, the lease was an obligation which plaintiff had undertaken. In this respect, the claim for losses on the subordinate lease is not unlike the claim for lost profits for future years, since plaintiff, after entering into the five year lease, could only suppose that the contract with the state would be renewed annually and that money for Title XX students would be available to fund the lease payments. Again, such a belief is founded upon speculation and thus not an element of provable damages.

 Finally, the court will deny plaintiff's claim for general damages which, as plaintiff admits, are not susceptible to precise calculation. Most important in this regard is plaintiff's claim that it was defamed and lost money because of defendant's revelations about Anthony Cifaldi's unfortunate past. Without reaching the question as to whether plaintiff established a cause of action for defamation and/or

---

**10.** Moreover, it should be noted that the awarded sum of $20,715.00, inasmuch as it purports to cover the vouchers submitted to the state for unpaid services constitutes, and reimburses for, the cost of providing care to Title XX students. That is, the vouchers covered the costs expended as well as the profits expected and in this respect fully compensates plaintiff for its cost of doing business during the period from July through September. The interest on loans and lease payments are but two items encompassed within the cost of doing business.

liable,[11] it is clear that plaintiff established no claim for damages on this score. To the contrary, Anthony Cifaldi, on direct examination, could not point to any loss because of the adverse publicity:

Q. Was there any publicity that was generated as a result of denial of the contract, through any news media?

A. Yes, especially with WJOB.

Q. Did that publicity have an impact on the school?

A. I believe it did. I believe it did, because it inferred it was a front organization for something other than a school. It inferred, and actually said it was a sole ownership by Anthony Cifaldi, a convicted felon. I don't think during that time that Jack the Ripper had as much publicity as I did.

Q. Did you, to your knowledge, lose a single student by virtue of that publicity?

A. No, I can't cite any case.

Q. Did you encounter anybody at any other location who told you they would not place a child at that school by virtue of the adverse publicity?

A. No, I can't recall that, either. The only thing I can recall at this point was the WJOB talk show concerning Mother Goose. I think it centered around, "Would you send your child to a school run by a convicted felon", and the responses were negative and positive, some of the former parents came through, that is the only thing I could gather. I mean, it seems to me like it was a lot of trouble to go through.

Q. Did any employee quit as a result of the publicity?

A. Not that I know of, no.

(Hearing on Damages, pp. 31–32). As the foregoing excerpt makes clear, plaintiff could not establish that any bad publicity impacted upon its school and accordingly, there is a dearth of evidence that defendant is responsible for damages in defaming or libeling plaintiff.

Taken in balance, the court is of the view that the damages attributable to defendant's conduct should necessarily be limited to the damages arising during the interim period between the time of submission (July 1978) of the contract and the time of non-approval (September 1978) during which plaintiff performed unreimbursed services for which no moneys were ever paid and lost profits for contract year 1978–79. That amount, $28,248.75 ($20,-715.00 + $7,533.75) is based upon the court's belief that this sum adequately redresses the plaintiff for the violation of its constitutional rights after having considered the nature of the interests involved and the facts of the case.

To the award of $28,248.75 in compensatory damages will be added prejudgment interest from the date it accrued until the date of entry of this order. The rate of interest will be calculated in accordance with the provisions of 28 U.S.C. § 1961 as presently enacted.[12]

The award of prejudgment interest is within the discretion of the court and is based upon traditional equitable

---

**11.** Rather, in most cases, the question of defamation, and/or libel, vis-a-vis a due process right, revolves around the question of whether the plaintiff merely raises the question, and in doing so, merely denies the allegation, *e.g., Seal v. Pryor,* 670 F.2d 96, 99 (8th Cir.1982), or goes on to attempt to prove the falsity of such an allegation. *See e.g., Ledford v. Delancey,* 612 F.2d 883, 886–7 (4th Cir.1980) (mere allegation of falsity apparently sufficient); *Smith v. Lehman,* 689 F.2d 342, 346 (2d Cir.1982), *cert. denied,* 459 U.S. 1173, 103 S.Ct. 820, 74 L.Ed.2d 1018 (1983). Here, unlike any such cases, plaintiff has never even intimated that the allegation

that Anthony Cifaldi did not properly submit his tax returns was false. *See Colaizzi v. Walker,* 655 F.2d 828, 831–32 (7th Cir.1981). Thus, one might conclude that the alleged libel is not actionable.

**12.** While 28 U.S.C. § 1961 is silent on the issue, it does not bar an award of prejudgment interest. *Bricklayers' Pension Trust Fund v. Taiariol,* 671 F.2d 988 (6th Cir.1982) and cases cited therein; *see also Rodgers v. United States,* 332 U.S. 371, 68 S.Ct. 5, 92 L.Ed. 3 (1947).

principles. *Bricklayers' Pension Trust Fund v. Taiariol,* 671 F.2d 988 (6th Cir. 1982); *American Timber & Trading Co. v. First National Bank of Oregon,* 690 F.2d 781 (9th Cir.1982). The underlying purpose of awarding interest on compensatory damages is to make the wronged party whole by compensating the wronged person for being deprived of the monetary loss, *i.e.,* the money and the use of the money. *Turner v. Japan Lines, Ltd.,* 702 F.2d 752 (9th Cir.1983); *American Timber; United States v. California State Board of Equalization,* 650 F.2d 1127 (9th Cir.1981), *aff'd. mem.,* 456 U.S. 985, 102 S.Ct. 2261, 72 L.Ed.2d 864 (1982).

## V

 Plaintiff seeks an award of attorney's fees if successful. Section 1988 of Title 42 of the United States Code so provides.[13] The court finds that costs and attorney's fees should be assessed against the defendant in this action. The considerations relevant to computing a reasonable attorney's fee award have been set forth by the United States Court of Appeals for the Seventh Circuit in *Waters v. Wisconsin Steel Works,* 502 F.2d 1309 (7th Cir.1974), *cert. denied,* 425 U.S. 997, 96 S.Ct. 2214, 48 L.Ed.2d 823 (1976). The time spent by the attorney is not to be simply multiplied by a billing rate. The primary factors in the computation include not only the time reasonably spent on the case, but also the value of the attorney's work, given local legal fees, and his abilities, reputation and degree of success in the case. Also relevant is whether the attorney's efforts in this case precluded him from working on other legal matters. These factors are drawn from the sections of the Code of Professional Responsibility that describe how an attorney should determine the fee he may properly charge a client, particularly D.R. 2–106.

While plaintiff's request for an award of attorney's fees will be granted, the court cannot at this time, on the showing before it, compute the proper amount of such an award. Plaintiff will therefore be directed to file not later than twenty (20) days from the date of this judgment a more complete breakdown and explanation of charges and time and such other material supporting the request for attorney's fees as is required by *Waters v. Wisconsin Steel Works.* The amount of such an award will be set by further order of the court. A copy of plaintiff's showing relating to attorney's fees shall be served on defendant, and defendant shall have ten (10) days from the date of filing to respond or otherwise challenge the showings and fees set forth.

### Conclusion

On the basis of the foregoing, this court finds that defendant is liable to plaintiff for the deprivation of its constitutional rights which can only be remedied by remuneration. Accordingly, it is ORDERED that the defendant pay the plaintiff the sum of Twenty Eight Thousand Two Hundred Forty-Eight Dollars and Seventy Five Cents ($28,248.75) together with prejudgment interest.

It is FURTHER ORDERED that plaintiff recover of and from the defendant attorney's fees in an amount to be set by further order of the court. Plaintiff is directed to file a more complete and explanatory statement of charges and an affidavit of counsel in support of its request for attorney's fees in a manner consistent with that set out in *Waters v. Wisconsin Steel Works,* 502 F.2d 1309 (7th Cir.1974), *cert. denied,* 425 U.S. 997, 96 S.Ct. 2214, 48 L.Ed.2d 823 (1976), not later than twenty (20) days from the date of this judgment. A copy of plaintiff's showing relating to attorney's fees shall be served on defendant, and defendant shall have ten (10) days

---

**13.** Section 1988 provides, in pertinent part:

In any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92–318, or title VI of the Civil Rights Act of 1964,

the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

from the date of filing to respond or otherwise challenge the showing and fees set forth.